Lillie BURTON, Vallie Danielles, et al., Plaintiffs-Appellants,

v.

CITY OF BELLE GLADE, Belle Glade City Commission, et al., Defendants-Appellees.

No. 97-5091.

United States Court of Appeals,

Eleventh Circuit.

June 25, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 95-8356-CV-KLR), Kenneth L. Ryskamp, Judge.

Before TJOFLAT, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Appellants, three African-American tenants of the Okeechobee Center, a housing project located in unincorporated Palm Beach County, and four African-American residents of the City of Belle Glade, brought this lawsuit alleging that the City of Belle Glade unlawfully deprived them of their right to vote in failing to annex the Okeechobee Center into the City. Specifically, Appellants contend that the City failed to annex the housing project for racial reasons in violation of the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, section 2 of the Voting Rights Act of 1965, and Title VI of the Civil Rights Act of 1964 and its implementing regulations. After extensive pre-trial proceedings, the district court granted summary judgment in favor of Appellees, the City of Belle Glade and others, on all counts, finding neither a constitutional nor a statutory violation.

On appeal, Appellants challenge the district court's order on three basic grounds: first, the district court purportedly erred in concluding that Appellants failed to raise a genuine issue of material fact as to Appellees' discriminatory *intent;* second, the district court also erred in holding that the remedies they sought—including the unusual remedy of ordering a city to annex property into its municipal boundaries—were neither available under the Voting Rights Act nor permissible under the Federal Rules of Civil Procedure; and finally, the district court erred in granting summary judgment *sua sponte* to Appellees

on Appellants' Title VI claims. After thoroughly reviewing the record and the parties' briefs, we affirm the district court's judgment concerning Appellants' constitutional and Voting Rights Act claims, as well as the Title VI statutory claim, but reverse and remand Appellants' cause of action to enforce Title VI's disparate impact regulations for further proceedings consistent with this opinion.

## I.

The historical facts and the procedural history necessary to understand this lawsuit are complex and extensive. At the core, however, this legal battle has been fought over the refusal of the City of Belle Glade ("City") to annex an adjacent housing project known as the Okeechobee Center Farmers' Home Administration Project ("Okeechobee Center") into its geographic and municipal boundaries.

The City of Belle Glade is an incorporated municipality located on the western side of Palm Beach County, near Florida's agricultural heartland. In the 1930s, the federal government created two housing projects outside the city limits. One of them, known as the Osceola Center, was populated by whites and stood at the City's northwest corner. The other, the Okeechobee Center, was populated by blacks and was located to the southwest of the City. In 1947, the City created the Belle Glade Housing Authority ("BGHA"), a board of seven members nominated by the mayor and appointed by the City Commission, to address the "shortage of safe sanitary dwelling accommodations in the City of Belle Glade available to persons of low income at rentals they can afford." The BGHA assumed ownership and operation of *both* the Osceola and Okeechobee Centers. The centers, however, remain funded in part by the federal government through grants from the Department of Agriculture. "Jim Crow" laws required both housing projects to be segregated by race.[1] During this time, the City also mandated residential segregation. *See, e.g.,* Belle Glade, Fla.,

---

[1] In March 1975, however, a group of tenants brought suit in federal district court against the Secretary of Agriculture and various local housing authorities under Title VI of the Civil Rights Act of 1964 to integrate the centers. *See Mae Golden Acres Tenants' Ass'n v. Butz,* No. 75-1161-CIV-JE (S.D.Fla.1975). On July 19, 1977, the district court entered a stipulation for consent judgment in the *Mae Golden Acres* litigation, which provided that the BGHA would no longer segregate the Osceola and Okeechobee Centers by race and would administer the projects according to racially non-discriminatory policies. This settlement marked the formal end of *de jure* segregation at the Osceola and Okeechobee Centers.

Ordinance 45, 184, 273, 443 (Nov. 18, 1931, Sept. 18, 1936, January 12, 1938, December 27, 1939). These ordinances were repealed, however, by 1963. *See* Belle Glade, Fla., Ordinance 63-11, § 1 (April 24, 1963) (repealing Belle Glade, Fla., Code §§ 26-14 to -17 (relating to zoning)).

In 1960, the total population of the City of Belle Glade was 11,273, of which 7,393 (65.6%) were non-whites and 3,880 (34.4%) were whites.[2] The following year, the City proposed, for the first time, extending its municipal boundaries by annexing both the Okeechobee and Osceola Centers. The City asked the property owner, BGHA, whether it had any views on the matter. After discussing the possible advantages and disadvantages, the BGHA ultimately petitioned to the City only for annexation of the Osceola Center. Soon thereafter, on April 26, 1961, the City Commission considered the BGHA's petition and unanimously annexed the Osceola Center.

In the 1970s, the City and the BGHA twice considered the possibility of annexing the Okeechobee Center. In 1971, the City Commission's minutes simply reflect that a meeting was to be arranged between the City Commission and the BGHA to discuss the possibility of annexing the Okeechobee Center. The minutes make no mention, however, of who made the annexation request or whether any meeting was ever held. Two years later, on February 26, 1973, a group of tenants from the Okeechobee Center asked the City Commission to annex the center. The City Commission advised the tenants that it would consider annexation if the BGHA made the request. On April 17, 1973, the tenants asked the BGHA to petition the City for annexation, but the BGHA denied their request in October 1973. The record does not reflect whether the BGHA offered any reason for denying the request.

---

[2]As of 1970, the total population of Belle Glade increased to 15,949, of which the percentage of blacks decreased to 52.9% while the percentage of whites increased to 46.5%. By 1993, a special census showed that the City's total population had increased further to 17,208, the population of blacks increasing to 54.8% and the white population decreasing to 39.6%. As of May 24, 1994, the population of the Osceola Center was 46% black, 50% Hispanic, and 4% white, whereas the population of the Okeechobee Center was 92% black and 8% Hispanic.

The following year, the Florida legislature repealed *all* local laws pertaining to the adjustment of municipal boundaries and established a *uniform* legislative standard for use throughout the state. *See* Municipal Annexation or Contraction Act, 1974 Fla. Laws ch. 74-190, § 1 (codified as amended at Fla. Stat. Ann. §§ 171.021-.022 (West 1987)). The statute specifically provided for the voluntary annexation of any property contiguous to a municipality upon petition by the property owner to the municipality's governing body. *See* 1974 Fla. Laws ch. 74-190, § 1 (codified as amended at Fla. Stat. Ann. § 171.044(1) (West Supp.1998)). The City Commission also could initiate annexation of any contiguous, compact, and unincorporated property by a referendum of the registered voters of the municipality and the residents of the area proposed to be annexed. *See* 1975 Fla. Laws ch. 75-297, § 2 (codified as amended at Fla. Stat. Ann. § 171.0413 (West.1987 & Supp.1998)). Notably, according to these provisions, the statute prohibited municipalities from annexing any property that did not meet the statute's definition of contiguity. *See* 1974 Fla. Laws ch. 74-190, § 1 (codified as amended at Fla. Stat. Ann. § 171.031(11) (West 1987)).[3]

Two attempts to secure the City's annexation of the Okeechobee Center through litigation occurred in 1980.[4] Pursuant to a settlement agreement, the City and City Commission agreed to appoint an "Annexation Committee" to investigate and make recommendations concerning the wisdom and efficacy of annexing the Okeechobee Center.[5] In November 1984, after the Committee held public hearings, received

---

[3]The parties dispute whether the Okeechobee Center is contiguous to the City, and, hence, available for annexation under Florida law. *See* discussion *infra* Part II.B.2.

[4]In *Okeechobee Center Cries for Help v. Belle Glade Housing Authority,* No. 80-8220-CIV-JAG (S.D.Fla.1980), tenants of the Okeechobee Center sued the City and the BGHA seeking, *inter alia,* a mandatory injunction requiring the defendants to take all steps necessary to annex the Okeechobee Center into Belle Glade. Similarly, in *Jackson v. City of Belle Glade,* 95 F.R.D. 384 (S.D.Fla.1982), some Belle Glade residents brought suit against the City and BGHA, seeking annexation of *all* black areas adjacent to the City The parties eventually resolved both lawsuits prior to trial without the plaintiffs' obtaining annexation and, in March 1984, the court dismissed the suits with prejudice.

[5]The City Commission appointed five members to this Committee: one member of the Okeechobee Center Tenant's Association, one black resident of the City as recommended by the Panhellenic Council, and three additional members, at least one of whom had to be a member of a minority group.

4

comments from the public, investigated and considered the possibilities and ramifications of annexation, and conducted a cost study of annexation, the Committee issued a report recommending *against* annexation on the grounds that the Okeechobee Center did not satisfy Florida's statutory contiguity requirement and that annexation did not make reasonable economic sense for the City.[6] However, the report also urged the City Commission to consider other factors "relating to the humanitarian aspects of those residing in Okeechobee Center" in light of residents' feelings "that annexation would right past 'wrongs.' " On January 28, 1985, the City Commission officially accepted the Annexation Committee's report.

As far as the record reflects, the tenants' efforts at annexing the Okeechobee Center lay dormant for over ten years, until May 8, 1995, when Albert Peterson, a resident of the Okeechobee Center and President of the Resident's Council of the Okeechobee and Osceola Centers, wrote Mayor Weeks requesting that the City annex the Okeechobee Center. On May 30, 1995, the Mayor denied Peterson's request, concluding that annexation would be "neither feasible nor advantageous to the City from the financial and public services perspective." The Mayor's letter summarized the findings of "[a] study of this issue that was done a number of years ago":

> Upon annexation, the City must provide the following municipal services: water, sewer, police protection, sanitation services, street lighting, street signs, street paving, maintenance, drainage, parks and recreation. Since the subject land is exempt from ad valorem taxes, no property taxes would be generated to offset the cost of providing the necessary services, which far outweigh any miscellaneous revenues that might be realized.

> Other factors in determining the viability of annexing the parcel included the following: 1) No need exists to expand into the proposed parcel, 2) No industry would be annexed, 3) The parcel would provide no additional facilities to be brought into the City, 4) Annexation would not improve the economy of the City, and 5) The Comprehensive Plan would have to be revised thereby compounding the expense to the City.

---

[6]Specifically, the report estimated the following capital outlay and first year start-up costs: library services, $158,693; inspection, $8,000; fire, $442,000; streets $7,140; building and grounds, $18,640; garbage collection, $138,483; police, $133,724; and parks and recreation, $119, 556. Thus, the total estimated costs were $1,026,236. The report further estimated that the property would generate miscellaneous revenues for the City of $126,000 per year.

City Attorney John Baker's legal opinion was that the City may not annex the property known as the Okeechobee Center because the said property is not contiguous to the municipal boundaries, and annexation is therefore prohibited by Florida statutes.

Because "costs have risen, conditions have not changed, and the laws have not been amended" since that study was conducted, the Mayor concluded that he would not propose annexation of the Okeechobee Center.

On June 12, 1995, four tenants of the Okeechobee Center[7] and four black residents of the City initiated this lawsuit seeking injunctive and declaratory relief against the City of Belle Glade, the Mayor of Belle Glade, the Belle Glade City Commission and its members, and the BGHA and its officers and members alleging that the BGHA's failure to petition for annexation and the City's failure to annex the Okeechobee Center, as well as the City's practice of annexing property populated by whites, denied or abridged the rights of Appellants to vote on account of race or color in violation of section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1994), and that these practices were adopted or purposefully maintained to dilute the voting strength of Appellants and deprive them of their rights secured by the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, as enforced under 42 U.S.C. § 1983 (1994 & Supp. II 1996). Appellants further alleged that the BGHA's failure to petition for annexation discriminated against the tenants of the Okeechobee Center on the basis of race, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4a (1994), and its implementing regulations, 7 C.F.R. § 15.3 (1999). The district court dismissed Appellants' claims to the extent that they relied on the First and Thirteenth Amendments, expressed its view that the remedy of forced annexation was not available under section 2 of the Voting Rights Act, and dismissed Appellants' constitutional claims without prejudice for failure to plead pursuant to 42 U.S.C. § 1983. Appellants subsequently filed an amended complaint.

Prior to trial, each side moved for summary judgment. The City filed a motion on Appellants' claims under section 2 of the Voting Rights Act, arguing that because the Okeechobee Center did not satisfy the

---

[7]On March 24, 1997, the district court granted Okeechobee tenant Charles Jackson's motion to withdraw as plaintiff. Three tenants remain in the suit.

statutory requirements for annexation set forth in Fla. Stat. Ann. § 171.044(1) (West Supp.1998), Appellants had no available remedy. Appellants, in turn, moved for summary judgment on their constitutional claims. On May 20, 1997, the district court granted summary judgment for Appellees on both the constitutional and Voting Rights Act claims. The court also granted summary judgment *sua sponte* for the BGHA on the remaining Title VI claims. Specifically, the district court held that because the Okeechobee Center was not "contiguous" to the City of Belle Glade, Florida law prohibited its annexation; that race discrimination did not cause the City's refusal to annex the Okeechobee Center; that judicially-compelled annexation was not an available remedy under the Voting Rights Act; that an injunction prohibiting the City from discriminating in future annexation decisions was not sufficiently specific to comply with Federal Rule of Civil Procedure 65(d); and, lastly, that there was no meaningful relief available for Appellants' Title VI claim because, even if the district court ordered the BGHA to petition for annexation, Florida law still prohibited the City from granting the request. *See Burton v. City of Belle Glade,* 966 F.Supp. 1178 (S.D.Fla.1997). This appeal followed.

## II.

We give plenary review to a district court's grant of summary judgment. *See Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1082 (11th Cir.1996). The governing standard is by now well understood. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As we have explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.

7

*Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir.1982) (citations omitted).  To withstand

a summary judgment motion, the non-moving party must establish that, based on the evidence in the record,

there can be more than one reasonable conclusion as to the proper verdict.  *See Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Consequently, "[t]he mere existence of a

scintilla of evidence in support of the [non-movant's] position will be insufficient;  there must be evidence

on which the jury could reasonably find for the [non-movant]."  *Id.* at 252, 106 S.Ct. 2505;  *see also Walker*

*v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

A.

*Section 1983:  Fourteenth and Fifteenth Amendment Claims*

Appellants[8] contend that the BGHA's refusal to petition for annexation of the Okeechobee Center

and the City's failure to annex the Center denied them the equal protection of the laws and deprived them of

the right to vote on account of race, both by denying their right to vote and by diluting their voting strength,

in violation of the Fourteenth and Fifteenth Amendments.[9]  Section 1983 provides a cause of action for

---

[8]Both groups of Appellants—the black citizens and registered voters of Belle Glade and the black, non-Belle-Glade-citizen tenants of the Okeechobee Center—make the same claims.  We observe at the outset, however, that in a very real sense these claims are distinct.  The Okeechobee Center tenants' claimed injury stems from an allegedly improper racial motive in Appellees' annexation decisions concerning the Okeechobee Center.  These allegations give rise to a traditional race discrimination claim under the Equal Protection Clause of the Fourteenth Amendment, and a vote denial claim under the Fifteenth Amendment.  In contrast, we construe the citizens of Belle Glade to complain that the BGHA and the City purposefully employed discriminatory practices to dilute the voting strength of black citizens within the City's boundaries.  These discriminatory practices, if proved, allegedly injured Belle Glade citizens because they enjoyed the right to vote in Belle Glade.  Because the Okeechobee Center tenants *never* possessed a right to vote within the City, Appellants' constitutional vote dilution claim may only be premised on the injuries of the Belle Glade citizens.  *See Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1244 (11th Cir.1998).  However, because vote dilution, vote denial, and traditional race discrimination claims arising under the Fourteenth and Fifteenth Amendments *all* require proof of intentional discrimination, *see infra,* we address Appellants' § 1983 claims as one.

[9]The Supreme Court has not yet determined conclusively whether vote dilution is prohibited by the Fourteenth Amendment, the Fifteenth Amendment, or both.  *See Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 495, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (Breyer, J., concurring in part and concurring in judgment) (citing *Rogers v. Lodge,* 458 U.S. 613, 617, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (Fourteenth Amendment covers vote dilution claims);  *City of Mobile v. Bolden,* 446 U.S. 55, 66, 100

constitutional violations committed under color of state law.[10] To prevail, plaintiffs must demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law. *See Arrington v. Cobb County,* 139 F.3d 865, 872 (11th

S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion) (same), and comparing *Mobile,* 446 U.S. at 62-63, 100 S.Ct. 1490 (intentional vote dilution may be illegal under Fifteenth Amendment), and *Gomillion v. Lightfoot,* 364 U.S. 339, 346, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (Fifteenth Amendment covers municipal boundaries drawn to exclude blacks), with *Mobile,* 446 U.S. at 84 n. 3, 100 S.Ct. 1490 (Stevens, J., concurring in judgment) (*Mobile* plurality said that Fifteenth Amendment does not reach vote dilution); *Voinovich v. Quilter,* 507 U.S. 146, 159, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims...."); *Shaw v. Reno,* 509 U.S. 630, 645, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (endorsing the *Gomillion* concurrence's Fourteenth Amendment approach); *Beer v. United States,* 425 U.S. 130, 142 n. 14, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976)). Both Amendments, however, require proof of discriminatory purpose. *See Bossier Parish,* 520 U.S. at 481, 117 S.Ct. 1491 ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the state or political subdivision acted with a discriminatory purpose."); *Lucas v. Townsend,* 967 F.2d 549, 551 (11th Cir.1992) (per curiam) (holding that claims of vote dilution under the Fourteenth and Fifteenth Amendment require proof of "a racially discriminatory purpose chargeable to the state"). Therefore, we decline to address this distinction.

Appellants' initial complaint also alleged vote dilution claims under the First and Thirteenth Amendments. Appellants argue that the district court erred in granting Appellees' motion to dismiss those claims. But since the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments, *see Washington v. Finlay,* 664 F.2d 913, 927-28 (4th Cir.1981); *Lucas v. Townsend,* 783 F.Supp. 605, 618 (M.D.Ga.1992), *aff'd on other grounds,* 967 F.2d 549 (11th Cir.1992), we conclude that the district court did not err in dismissing these claims.

[10]Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

Early in this litigation, Appellees moved to dismiss Appellants' First Amended Complaint on the ground that they improperly pleaded claims directly under the Constitution. The district court granted this motion without prejudice and Appellants filed a Second Amended Complaint. Appellants now argue that the district court erred in dismissing their first complaint. However, because Appellants were made whole by filing a second complaint, *see* Fed.R.Civ.P. 15(a), this issue is now moot. *See Purcell v. BankAtlantic Fin. Corp.,* 85 F.3d 1508, 1511 n. 3 (11th Cir.1996) (" 'Central to a finding of mootness is a determination by an appellate court that it cannot grant effective judicial relief.' ") (quoting *In re Club Assocs.,* 956 F.2d 1065, 1069 (11th Cir.1992)).

9

Cir.1998). Because Appellees concede they acted under color of state law, we need only address whether Appellees acted in violation of the Constitution.

Section 1983 claims, moreover, are governed by the forum state's residual personal injury statute of limitations. *See Owens v. Okure,* 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Specifically, a plaintiff must commence a § 1983 claim arising in Florida within four years of the allegedly unconstitutional or otherwise illegal act. *See Baker v. Gulf & Western Indus., Inc.,* 850 F.2d 1480, 1483 (11th Cir.1988). The City's *1995* decision to deny Appellants' request for annexation of the Okeechobee Center is the only act that occurred during the limitations period. Therefore, Appellants' § 1983 claims rest solely on the constitutionality of that decision.

Moreover, to establish a violation of either the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, Appellants must show that the City's decision or act had a discriminatory purpose and effect. *See Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 481, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 241-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Discriminatory purpose may be established by proof that the City used race as a substantial or motivating factor in its annexation decisions and practices. *See Arlington Heights,* 429 U.S. at 265-66, 97 S.Ct. 555. If the City's annexation decisions created an express racial classification, no inquiry into discriminatory purpose is necessary. *See Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (citing *Personnel Administrator v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). However, once a discriminatory purpose is established, the burden shifts to Appellees to prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

We evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision. In *Arlington Heights,* the Supreme

10

Court suggested that relevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision. *See* 429 U.S. at 265-69, 97 S.Ct. 555. Moreover, we have repeatedly recognized that evidence of " '[t]he historical background of the decision' " is relevant to the issue of discriminatory intent. *Williams v. City of Dothan,* 745 F.2d 1406, 1415 (11th Cir.1984) (quoting *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555); *see also Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir.1993) (holding that discriminatory intent may be established by, among other things, a history of discriminatory official actions); *Ammons v. Dade City,* 783 F.2d 982, 988 (11th Cir.1986) (per curiam) (noting that district court "correctly relied upon a large body of constitutional jurisprudence which recognizes that the historical context of a challenged activity may constitute relevant evidence of intentional discrimination"); *Dowdell v. City of Apopka,* 698 F.2d 1181, 1186 (11th Cir.1983) (recognizing that historical pattern of decision-making was relevant to district court's finding of discriminatory intent). Indeed, all "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 464, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).[11]

At the heart of their appeal, Appellants argue that the district court erred in holding that no reasonable jury could conclude that race was a substantial or motivating factor in the City's 1995 annexation decision. Appellants point to three categories of evidence supporting a claim of intentional race discrimination: first,

---

[11]Appellants suggest that the district court erred in excluding relevant evidence that occurred outside of the statute of limitations period. Specifically, Appellants assert that the four-year statute of limitations should not operate to exclude relevant historical evidence of past discriminatory practices. To the extent the district court suggested that it would exclude evidence of discrimination that *preceded* the 1995 act at issue—the only act occurring within the limitations period—we believe that the district court erred. *See City of Dothan,* 745 F.2d at 1415-16 (holding that district court erred in excluding evidence of municipal decisions that occurred outside the statute of limitations period on ground that evidence was relevant to issue of defendant's later discriminatory intent). However, because the district court did, in fact, consider all of Appellants' evidence, *see Burton,* 966 F.Supp. at 1182, and because an examination of all of the proffered evidence does not alter the result, any error plainly would be harmless.

11

Appellants assert that since there was direct evidence of a *de jure* racial classification in Belle Glade housing before 1977, any inquiry into Appellees' discriminatory intent is unnecessary; second, they suggest that the bizarre shape of the City's municipal boundaries is circumstantial evidence of improper racial motive under *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); and third, they contend that they have presented substantial circumstantial evidence of the City's discriminatory intent in failing to annex the Okeechobee Center. Taken together, they argue, these categories of evidence raise a genuine issue of material fact as to whether race was a substantial or motivating factor in the City's 1995 decision to refuse annexation of the Okeechobee Center. We are not persuaded by Appellants' arguments either standing alone or in concert, but consider each in turn.

1.

*De Jure Racial Classification*

Appellants first argue that the City's annexation of the Osceola Center constituted the enforcement of a *de jure* racial classification. Because Belle Glade ordinances required racial segregation in residential housing, Appellants contend that the City's annexation of the *Osceola Center* back in 1961 constituted the enforcement of a *de jure* racial classification. Appellants, therefore, assert that the district court erred in failing to engage in the stringent review required for cases involving prior *de jure* segregation. This claim is unavailing.

The central purpose of the Equal Protection Clause of the Fourteenth Amendment is to prohibit states from discriminating against individuals on the basis of race. Plainly, where the racial classification appears on the face of the statute, no inquiry into legislative purpose is necessary. *See Shaw,* 509 U.S. at 642, 113 S.Ct. 2816 (citing *Feeney,* 442 U.S. at 272, 99 S.Ct. 2282). Such racial classifications are presumptively invalid and can only survive constitutional scrutiny if they are justified by a compelling state interest and are narrowly tailored to serve that interest. *See id.* at 643, 113 S.Ct. 2816. Moreover, Appellants argue that defendants should carry an even greater burden in this case, just as they do in the context of higher education.

12

*See United States v. Fordice,* 505 U.S. 717, 727-32, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). Where there is evidence that a current practice is "traceable" to or is "rooted" in a prior policy of segregation in education, defendants can only avoid liability by proving that the current policy does not have "continuing segregative effects or, even if it does, that there exists no practicable and educationally sound means of remedying any such effects." *Knight v. Alabama,* 14 F.3d 1534, 1550 (11th Cir.1994).

In this case, however, the district court did not err in failing to require Appellees to prove that they attempted to remedy the effects of prior *de jure* segregation. In the first place, Appellants can point to no court that has ever applied *Fordice* outside of the education setting. Indeed, given the unique nature of school desegregation, we hesitate to extend *Fordice* to a property annexation case. But even if we assume, *arguendo,* that the analysis applies, Appellants have failed to demonstrate that the City's 1995 annexation decision is, in any way, "traceable" to or "rooted" in past *de jure* segregation. *Knight,* 14 F.3d at 1540-41 (noting that plaintiff has burden of proof to show that challenged policy is "traceable" to past segregation). The City's 1961 decision to annex the *Osceola Center,* the white housing project, and the concomitant "determination" not to annex the Okeechobee Center, the black housing project, when the BGHA only petitioned for Osceola's annexation, neither created a racial classification nor enforced the City's segregation laws. Although the two centers were segregated by race in 1961, on this record there is simply no evidence that residential segregation laws dictated which center the City annexed, or, indeed, that race played any role in the process. Moreover, there is no evidence that the City had any policy, either in 1961 or later, of making annexation decisions on the basis of the race of the residents in the proposed annexation areas. It is even unclear on this record that the City ever entertained a request to annex the Okeechobee Center in 1961, or, for that matter, that the Okeechobee Center was similarly situated to the Osceola Center, let alone evidence showing that the decision to annex the Osceola Center was somehow based on the race of its occupants. Nondiscriminatory reasons were offered to explain the Osceola annexation—including evidence that the BGHA requested annexation to provide City police protection to the residents due to ongoing threats against

13

the center's manager—and Appellants have presented nothing to rebut this. While it is undeniably true that the two centers were segregated by race in 1961, Appellants notably have been unable to draw some connection between that *de jure* policy and the decision to annex the Osceola Center. Accordingly, we cannot find that the City enforced any policy of racial classification in its annexation decisions. Absent such evidence, the district court did not err in refusing to require Appellees to present evidence of their efforts to remedy prior *de jure* segregation.

The very most Appellants could argue is that the existence of the City's segregation ordinances may have raised an inference of discriminatory intent back in 1961. The existence of these ordinances, however, which were abolished more than twenty years before the 1995 decision, can in no way transform this cause of action into a challenge to the enforcement of a racial classification or *de jure* segregation.

2.

*Municipal Boundaries*

Appellants also suggest that the municipal boundaries of the City of Belle Glade are so bizarre as to raise an inference of racially discriminatory intent under the racial gerrymandering case of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Appellants assert that the City's decision to annex State Road Number 80 in 1965 and its deliberate decision not to annex the black population centers on either side of the highway, rendered the boundaries of Belle Glade bizarre. They argue, therefore, that this annexation is facially suspect and triggers strict scrutiny under the Fourteenth Amendment, and that the district court again erred in failing to shift the burden to Appellees to produce evidence that the municipal boundary was shaped by decisions that were narrowly tailored to achieve a compelling governmental interest. We find this argument similarly unpersuasive.

To establish that a districting scheme amounts to impermissible racial gerrymandering, a plaintiff bears the burden of proving that race was the *predominant* factor in the legislature's decision either through " 'circumstantial evidence of a district's shape and demographics' or through 'more direct evidence going to

14

legislative purpose.' " *Shaw v. Hunt,* 517 U.S. 899, 905, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) [hereinafter *Shaw II* ] (quoting *Miller v. Johnson,* 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)).  As the Supreme Court explained in *Miller:*

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.

515 U.S. at 913, 115 S.Ct. 2475.  A plaintiff will not prevail, however, simply by pointing to the bizarre shape of a legislative district where the district lines are facially race neutral.  Under those circumstances, "a more searching inquiry is necessary before strict scrutiny can be found applicable."  *Bush v. Vera,* 517 U.S. 952, 958, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (quotations omitted).  Moreover, a state may defeat an allegation of racial gerrymandering by establishing that race-neutral considerations motivated the redistricting legislation and that those considerations were not "subordinated" to race.  *Miller,* 515 U.S. at 916, 115 S.Ct. 2475.  Once a plaintiff proves that race was the predominant factor, however, the redistricting decision then becomes subject to strict scrutiny:  it must be justified by a compelling state interest and be narrowly tailored to achieve that interest.  *See Shaw II,* 517 U.S. at 908, 116 S.Ct. 1894 (citing *Miller,* 515 U.S. at 920, 115 S.Ct. 2475).

Appellants' *Shaw* argument faces multiple infirmities.[12]  To begin with, as far as we can discern, no court has ever applied *Shaw* outside the racial gerrymandering context.  Moreover, *Shaw* and other racial gerrymandering cases are legally distinguishable from the instant case.  In racial gerrymandering cases, plaintiffs typically challenge laws affirmatively enacted to alter the boundaries of voting districts.  These

_____

[12]It is unclear whether all of the Appellants have standing to bring a Fourteenth Amendment claim under *Shaw.* In *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), the Supreme Court held that plaintiffs who reside in a racially gerrymandered district have standing to challenge a legislature's reapportionment scheme. *See id.* at 745, 115 S.Ct. 2431.  For non-resident plaintiffs to have standing, however, the Court noted that they would have to show specific evidence that they were personally subjected to a racial classification. *See id.*  Here, the non-BelleGlade-citizen Appellants would have to prove that they personally were not annexed into the City on the basis of their race.

15

jurisdictions are under an affirmative legal duty to alter their boundaries to reflect shifts or alterations in population. In sharp contrast, however, is a city's right to determine if and when it will expand its municipal boundaries. Although the City of Belle Glade may well be bizarrely shaped, its contours were created over an extended time period as hundreds of individual parcels were brought into its ambit incrementally; it was not created by a single scheme designed to exclude property on the basis of race. *Cf. Chen v. City of Houston,* 9 F.Supp.2d 745, 754 (S.D.Tex.1998) (refusing to apply strict scrutiny under *Shaw* solely based on bizarreness of city's redistricting plan where repeated annexation, not districting decision-making, caused irregular shape of districts). Moreover, not surprisingly, Appellants have been unable to show that the annexation of any specific piece of property, including the Okeechobee Center, would make the shape of the City of Belle Glade any less "bizarre."

The central problem with Appellants' argument is that the City's shape has not been shown to have been created because of any affirmative annexation plan. Rather, the City's pattern of annexation over time merely reflects the aggregation of various owners' requests for annexation, which the City generally approves so long as the proposed annexations satisfies the obligations of Florida law, and annexations initiated solely by the City, which also must conform to Florida law and which City voters and annex residents must approve by referendum. *See* Fla. Stat. Ann. §§ 171.044(1), 171.0413. Absent some other evidence, such as the circumstances surrounding a multitude of other annexation decisions, the specific racial composition of each of these areas, whether the unincorporated areas ever requested annexation, or perhaps some comparison of the shapes of other Florida municipalities, we cannot find that the municipal boundaries *alone* raise an inference of the City's racially discriminatory intent. Thus, whether or not a *Shaw* analysis could apply in the context of municipal property annexation, the simple fact is that this record is wholly insufficient to raise a genuine issue of material fact to support a distinct claim under *Shaw.*

3.

*Circumstantial Evidence of Discrimination*

16

Finally, Appellants claim that the circumstantial evidence, when weighed together, establishes the City's discriminatory motive or intent in refusing to annex the Okeechobee Center in 1995. Indeed, Appellants argue that the City's annexation decisions cannot be explained in non-racial terms. Appellants, therefore, contend that the district court erred in concluding that they failed to raise a genuine issue of material fact as to whether race was a substantial or motivating factor behind the City's *1995* decision to refuse annexation of the Okeechobee Center. *See Arlington Heights,* 429 U.S. at 265-66, 97 S.Ct. 555. Appellants also assert that the district court further erred in failing to shift the burden to Appellees to prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason. *See Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568. Appellants are incorrect on both counts.

Turning to the circumstantial evidence surrounding the 1995 decision, Appellants contend that two additional pieces of evidence establish the City's discriminatory purpose. Appellants argue that the City's justification of costs in refusing to annex the Okeechobee Center raises an inference of race discrimination because the City does not usually consider costs when deciding whether to annex property. Appellants also assert that the City's view that Florida law prohibited annexation of the Okeechobee Center was a mere pretext for the City's discriminatory purpose. Neither argument raises an inference of discriminatory intent.

First, the City's reliance on cost as a justification for refusing to annex the Okeechobee Center in 1995 does not raise a genuine issue of material fact as to the City's allegedly improper racial motive. Appellants have offered no evidence to support their contention that the City does not usually consider cost in making annexation decisions. However, even if we were to assume, *arguendo,* that some disparity exists, we fail to see how reliance on cost here raises an inference of race animus. As the Annexation Committee found back in 1984, providing the necessary municipal services to the Okeechobee Center would be a very expensive proposition for the City of Belle Glade. Moreover, because the property is exempt from ad valorem taxes, the City would enjoy little revenue to offset this expense. Thus, the City's reliance on costs was altogether reasonable under the circumstances. Indeed, a Florida municipality has an obligation to its

17

citizens to consider the economic impact of annexations.[13]  Therefore, we decline to accept Appellants' suggestion that the City's reliance on cost was a pretext for race discrimination.

Second, the City's conclusion that Florida law prohibited annexation of the Okeechobee center does not raise an inference of race discrimination.  The parties do not dispute that the Okeechobee Center could only be annexed if contiguous to the City, and that its contiguity would arise only from its proximity to State Road Number 80, which the City annexed in 1965.  Therefore, Okeechobee's contiguity turns on whether a municipality may use a previously annexed road to gain contiguity to otherwise non-contiguous property.  Florida law, however, is hotly disputed and far from settled on this question.

Since 1974, Florida law has provided that an owner of reasonably compact[14] property that is contiguous[15] to a municipality may petition for annexation.  *See* Fla. Stat. Ann. § 171.044(1) (West

---

[13]Section 171.021 provides:

> The purposes of this act are to set forth procedures for adjusting the boundaries of municipalities through annexations or contractions or corporate limits and to set forth criteria for determining when annexations or contractions may take place so as to:
>
> (1) Insure sound urban development and accommodation to growth.
>
> (2) Establish uniform legislative standards throughout the state for the adjustment of municipal boundaries.
>
> (3) Insure the efficient provision of urban services to areas that become urban in character.
>
> (4) Insure that areas are not annexed unless municipal services can be provided to those areas.

Fla. Stat. Ann. § 171.021.

[14]" 'Compactness' means concentration of a piece of property in a single area and precludes any action which would create enclaves, pockets, or finger areas in serpentine patterns.  Any annexation proceeding in any county in the state shall be designed in such a manner as to ensure that the area will be reasonably compact."  Fla. Stat. Ann. § 171.031(12).

[15]" 'Contiguous' means that a substantial part of a boundary of the territory sought to be annexed by the municipality is coterminous with a part of the boundary of the municipality....  However, nothing herein shall be construed to allow local rights-of-way, utility easements, railroad rights-of-way, or like

18

Supp.1998). In 1977, the Florida Attorney General considered whether Florida law permitted a municipality to annex property only contiguous to the municipality by virtue of a previously annexed road.[16] *See* 1977 Fla. Op. Atty. Gen. 35. Recognizing that no Florida appellate court had considered the issue, the Attorney General concluded that a parcel may not be voluntarily annexed if it is only contiguous to the City by virtue of a previously annexed highway because such annexation would violate both Florida's contiguity requirement and its prohibition against the creation of enclaves. *See id.* Then, in 1985, the Attorney General considered whether a municipality could voluntarily annex property contiguous on one side to a previously annexed, 125 foot-wide corridor of unimproved land, but otherwise surrounded by unincorporated property. *See* 1985 Fla. Op. Atty. Gen. 163. Although concluding that the city could not voluntarily annex the parcel because it would result in the creation of a prohibited enclave, the Attorney General found that Florida's contiguity requirement would not prohibit the municipality from using the corridor of unimproved land to gain contiguity because the statute did not apply to property annexed before 1974. *Id.* The Attorney General, however, never reconciled his finding of contiguity in the 1985 opinion with the conclusion he had reached eight years earlier.

Based on this undeniably conflicting authority, we conclude that the City's reliance on the 1974 annexation statute as a justification for the denial of Peterson's request to annex the Okeechobee Center does

---

entities to be annexed in a corridor fashion to gain contiguity...." Fla. Stat. Ann. § 171.031(11).

> Prior to 1975, section 171.031(11) stated, in relevant part: "Local rights-of-way, utility easements, or railroad rights-of-way shall not be annexed in a corridor fashion to gain contiguity *nor shall such activity be deemed to establish the contiguity required under this act.*" 1974 Fla. Laws ch. 74-190, § 1 (emphasis added). Since the underscored language was deleted in 1975, *see* 1975 Fla. Laws ch. 75-297, Appellants contend that the statute only prohibits annexation of roads to gain contiguity, but it does not bar annexation of property contiguous to a previously annexed road. Even assuming, *arguendo,* that Appellants' statutory interpretation is correct—and we have no need to resolve this question of Florida law today—the amended language does not establish that the City's statutory interpretation was unreasonable.

[16]Although Florida Opinions of the Attorney General are not binding on this Court, they "are entitled to careful consideration and generally should be regarded as highly persuasive" of matters of Florida law. *State v. Family Bank of Hallandale,* 623 So.2d 474, 478 (Fla.1993).

not raise a genuine issue of material fact as to the City's discriminatory intent in 1995. Even if we were to determine today that Florida law permits annexation—and the law is anything but clear as to this matter—we would still conclude that the City's interpretation was an altogether reasonable one given the plainly conflicting Attorney General opinions.[17] In short, the City's reliance on the 1974 annexation statute cannot fairly be taken as being a pretext for race discrimination.

The only other evidence presented by Appellants relates to the historical background to the City's 1995 decision. However, "the historical background for a given decision is only one factor relative to intent. It does not, by itself, compel [a court] to find a discriminatory purpose behind every statute passed during regrettable periods of [a state's] past." *Hall v. Holder,* 117 F.3d 1222, 1226-27 (11th Cir.1997). Nevertheless, Appellants point to three pieces of historical evidence. First, the City's housing ordinances mandated residential segregation until 1963. Second, the Osceola and Okeechobee Centers were segregated by race until 1977. Lastly, the BGHA failed to petition the Okeechobee Center in 1961 and 1973 and the City failed to annex in 1961, 1971, and 1985. This evidence is far too remote and attenuated to be probative of any discriminatory purpose in 1995. Simply put, we fail to see how evidence of past residential segregation in housing, which ended almost twenty years before the decision at issue, and which is wholly unconnected to any annexation decision, or a prior refusal to annex standing alone establishes *any* intent, let alone a discriminatory one, in 1995. As we said in *Holder,* "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *Mobile,* 446 U.S. at 74, 100 S.Ct.

---

[17]Indeed, the district court determined that the City's interpretation was correct as a matter of statutory construction. *See Burton,* 966 F.Supp. at 1183. According to the district court, the propriety of using a road annexation to gain contiguity cannot turn on the subjective intent of the municipality in initially annexing the road. The court reasoned that the Florida legislature could not have intended for so strange a construction. *See id.* at 1183-84. However, we need not reach the merits of this issue to resolve the instant case.

Concluding that the proposed annexation of the Okeechobee Center would have been illegal under Florida law since 1974, the district court also held that this statute was the intervening cause of Appellants' injuries. *See Burton,* 966 F.Supp. at 1183-84. Again, it is unnecessary to reach the merits of this issue.

1490); *see also Freeman v. Pitts,* 503 U.S. 467, 495-96, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Appellants' historical evidence does not raise a genuine issue of material fact as to whether the City's 1995 decision to refuse annexation of the Okeechobee Center was motivated by race.

On the basis of this record, viewing all of the circumstantial evidence and drawing all inferences in the light most favorable to Appellants, we conclude that Appellants have failed to raise a genuine issue of material fact as to whether the City's 1995 decision was racially motivated. No jury could reasonably find for Appellants based on this record. In the first place, the City's reliance on cost—a possible expense to the City of close to one million dollars—was an altogether reasonable basis on which to refuse annexation. Second, the City's reliance on Florida's contiguity requirement to deny annexation was likewise reasonable given the conflicting authority in Florida law, and in no way supports an inference of pretext for race discrimination. Lastly, Appellants' historical evidence, which at most arguably raised an inference of the City's discriminatory intent in the 1960s and 1970s, offers no plausible connection between any conceivable discriminatory intent rooted in the past and the 1995 act at issue today. Taken together, this evidence does not raise a genuine issue of material fact as to the City's discriminatory intent in *1995.*

Finally, the district court did not err in failing to consider the second prong of the *Mount Healthy* test. If Appellants cannot first prove that race was a motivating factor, there is no basis for shifting the burden to the City to determine whether, by a preponderance of the evidence, it would have made the same decision notwithstanding its racial motivation. *See Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568. Accordingly, we hold that the district court properly granted summary judgment in favor of Appellees on Appellants' § 1983 claims.

B.

*Section 2 of the Voting Rights Act of 1965*

Appellants also contend that the BGHA's refusal to petition and the City's failure to annex the Okeechobee Center violated section 2 of the Voting Rights Act of 1965. Section 2, 42 U.S.C. § 1973, "was

21

designed as a means of eradicating voting practices that 'minimize or cancel out the voting strength and political effectiveness of minority groups.' " *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 479, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (quoting S.Rep. No. 97-417, at 28 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205).  It "prohibits all forms of voting discrimination." *Thornburg v. Gingles,* 478 U.S. 30, 45 n. 10, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (citing S.Rep. No. 97-417 at 30, *reprinted in* 1982 U.S.C.C.A.N. at 207-08).  Specifically, two distinct types of discriminatory practices and procedures are covered under section 2: those that result in "vote denial" and those that result in "vote dilution."

In 1982, Congress amended section 2 to clarify that a plaintiff may establish a violation by a showing of discriminatory results alone.[18]  *See* Voting Rights Act Amendments of 1982, Pub.L. No. 97-205, § 3, 96 Stat. 131, 134 (1982).  As amended, section 2 states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2)[19] of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

---

[18]This amendment superceded the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 61-62, 100 S.Ct. 1490 (1980) (plurality opinion), which had held that both the Fifteenth Amendment and section 2 of the Voting Rights Act require proof of intentional discrimination.

[19]Section 1973b(f)(2) provides:  "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group." 42 U.S.C. § 1973b(f)(2) (1994).

42 U.S.C. § 1973(a), (b).  Subsection (b) has come to be known as the "results test" because it seeks to measure the *effect* of vote dilution.[20]

---

[20]A Senate Report accompanying the 1982 amendment sets forth " 'typical factors' " that may show a violation of section 2 under this test.  *Gingles,* 478 U.S. at 36, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 28-29, *reprinted in* 1982 U.S.C.C.A.N. at 206-207).  These factors include:

> "1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;  [and]
>
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
>
> Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
>
>> whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]
>>
>> whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Id.* at 36-37, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 28-29, *reprinted in* 1982 U.S.C.C.A.N. at 206-07).  However, " 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' "  *Id.* at 45, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 29, *reprinted in* 1982 U.S.C.C.A.N. at 206-07).

Appellants have alleged claims of both vote denial and vote dilution.[21] The district court, however, elected not to reach the merits of either of Appellant's section 2 claims. Rather, the district court granted Appellees' motion for summary judgment explaining that mandatory annexation is not an available remedy under the Voting Rights Act. The district court also considered each of the required factors in a vote dilution claim, *see infra* II.B.2, and concluded that it doubted whether Appellants had even made a prima facie showing under section 2. *See Burton,* 966 F.Supp. at 1186 n. 10. After thoroughly searching this record, we likewise conclude that Appellants have failed to establish a genuine issue of material fact as to either vote denial or vote dilution under section 2 of the Voting Rights Act.[22] On the record presented, we agree with the district court that court-ordered annexation is not an appropriate remedy to redress either of Appellants' alleged injuries—vote denial or vote dilution.[23]

1.

*Vote Denial*

---

[21]Appellants' vote dilution claim, we believe, may be premised only upon the claimed injuries of Belle Glade's black citizens. This is true because only those who enjoy the right to vote in Belle Glade may have their voting strength diluted by the City's annexation decisions. In contrast, Appellants' vote denial claim may only arise from injuries of black tenants of the Okeechobee Center. *See supra* note 8.

[22]We need not reach the question of whether a challenge to a city's failure to annex adjacent property is cognizable under section 2 of the Voting Rights Act. In *Perkins v. Matthews,* the Supreme Court held that municipal annexation is a " 'standard, practice or procedure with respect to voting' " that is subject to preclearance under section 5 of the Voting Rights Act. 400 U.S. 379, 388, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) (quoting Voting Rights Act of 1965 § 5, 42 U.S.C. § 1973c). Sections 2 and 5, however, "combat different evils and ... impose very different duties upon the States." *See Bossier Parish,* 520 U.S. 471, 477, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997). We only assume, *arguendo,* that the City of Belle Glade's refusal to annex the Okeechobee Center is a "standard, practice, or procedure" that gives rise to a claim under section 2. 42 U.S.C. § 1973(a). *But see Holder v. Hall,* 512 U.S. 874, 884, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (opinion of Kennedy, J., joined by Rehnquist, C.J.) ("[W]e think it quite improbable to suggest that a § 2 dilution challenge could be brought to a town's existing political boundaries (in an attempt to force it to annex surrounding land) by arguing that the current boundaries dilute a racial group's voting strength in comparison to the proposed new boundaries.").

[23]We address the availability of a remedy as part of Appellants' prima facie case of vote dilution.

24

Vote denial occurs when a state, or here a municipality, employs a "standard, practice, or procedure" that results in the denial of the right to vote on account of race. 42 U.S.C. § 1973(a). To prevail, Appellants must prove that, "under the totality of the circumstances, ... the political processes ... are not equally open to participation by [members of a protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). In making this determination, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.' " *Gingles,* 478 U.S. at 44, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 27, *reprinted in* 1982 U.S.C.C.A.N. at 205); *see* factors listed *supra* note 20.

Appellants have failed to raise a genuine issue of material fact as to whether they were denied the right to vote on account of race. First, they have not offered any evidence of a " 'history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.' " *Gingles,* 478 U.S. at 36-37, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 28, *reprinted in* 1982 U.S.C.C.A.N. at 206). Although Appellants have presented evidence of housing segregation in Belle Glade and in the two centers, we can find no evidence of any discrimination with respect to *voting.* Second, there is no evidence that Belle Glade uses or used any " 'voting practices or procedures that may enhance the opportunity for discrimination against the minority group.' " *Id.* at 37, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 28, *reprinted in* 1982 U.S.C.C.A.N. at 206). Third, we can find no evidence in this record that the black citizens of Belle Glade " 'bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.' " *Id.* (quoting S.Rep. No. 97-417 at 28, *reprinted in* 1982 U.S.C.C.A.N. at 206). Lastly, there is no evidence of any " 'significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.' " *Id.* (quoting S.Rep. No. 97-417 at 28, *reprinted in* 1982 U.S.C.C.A.N. at 207). Nor is there any circumstantial evidence

tending to suggest that the tenants of the Okeechobee Center were denied the right to vote on account of their race. Simply put, Appellants have failed to meet their burden of proving vote denial under section 2 of the Voting Rights Act.

2.

*Vote Dilution*

In contrast, vote dilution occurs when an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice.

In *Thornburg v. Gingles,* the Supreme Court identified three threshold preconditions for establishing a section 2 vote dilution claim: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) "the minority group must be able to show that it is politically cohesive"; and (3) "the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."[24] 478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Proof of each of these *Gingles* factors is necessary, but not sufficient, to prevail under a section 2 vote dilution claim. *See id.* at 50, 106 S.Ct. 2752. Upon successfully establishing each of the *Gingles* prerequisites, plaintiffs also must show that, under the totality of the circumstances, the challenged electoral scheme deprives them of "an equal measure of political and electoral opportunity" to participate in the political process and to elect representatives of their choosing. *Johnson v. De Grandy,* 512 U.S. 997, 1013, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).

---

[24]The Supreme Court has recognized that the *Gingles* factors "cannot be applied mechanically without regard to the nature of the claim." *Voinovich v. Quilter,* 507 U.S. 146, 158, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). To date, the Court has applied these factors to section 2 vote dilution claims challenging multi-member districts, *see Gingles,* 478 U.S. at 48-51, 106 S.Ct. 2752; single-member districts, *see Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); and majority-minority districts, *see Voinovich,* 507 U.S. at 153-54, 113 S.Ct. 1149. Moreover, in *Brooks v. Miller,* we recently applied the *Gingles* factors to a section 2 claim challenging a majority vote requirement. *See* 158 F.3d 1230, 1239 (11th Cir.1998), *cert. denied,* --- U.S. ----, 119 S.Ct. 1805, --- L.Ed.2d ----, 67 U.S.L.W. 3614 (U.S. May 24, 1999) (No. 98-1521). No court has ever addressed, however, whether the *Gingles* factors apply to a vote dilution claim premised on a failure to annex. Because Appellants have failed to meet the three *Gingles* preconditions, we have no need to reach the merits of this question either.

Appellants have failed to raise a genuine issue of material fact as to any of the three *Gingles* prerequisites, and, therefore, their section 2 vote dilution claim must fail as well. We address each *Gingles* factor in turn.

We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy. *See Brooks v. Miller,* 158 F.3d 1230, 1239 (11th Cir.1998), *cert. denied,* --- U.S. ----, 119 S.Ct. 1805, --- L.Ed.2d ----, 67 U.S.L.W. 3614 (U.S. May 24, 1999) (No. 98-1521); *Davis v. Chiles,* 139 F.3d 1414, 1419 (11th Cir.1998), *cert. denied,* --- U.S.----, 119 S.Ct. 1139, 143 L.Ed.2d 208 (1999); *Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1289, 1294-97 (11th Cir.1995) (en banc); *Nipper v. Smith,* 39 F.3d 1494, 1530-31 (11th Cir.1994) (en banc). This requirement simply serves " 'to establish that the minority has the potential to elect a representative of its own choice from some single-member district.' " *Nipper,* 39 F.3d at 1530 (quoting *Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993)). Thus, if a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury. *See Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. As we explained in *Nipper:*

> The inquiries into remedy and liability ... cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.
>
> ....
>
> ... The absence of an available remedy is not only relevant at the remedial stage of the litigation but also precludes, under the totality of the circumstances inquiry, a finding of liability.

39 F.3d at 1530-31, 1533. Accordingly, the failure to establish the first *Gingles* factor—the availability of a remedy—is fatal to a plaintiff's section 2 claim.

Appellants argue that the district court erred in concluding that court-ordered annexation and an injunction against future discrimination in annexation decisions are not available remedies under the Voting Rights Act. We disagree. Specifically, Appellants prayed for *two* different forms of relief to redress their section 2 claims: an order requiring Belle Glade "to take all steps necessary to effectuate the annexation of

27

the Okeechobee Center" into Belle Glade, and an injunction prohibiting Belle Glade "from enforcing any and all racially discriminatory policy(ies) in their decisions as to which parcels of land to annex."[25] Neither of these remedies are appropriate.

Court-ordered *annexation* is a remedy of unprecedented scope and magnitude. Indeed, we are not surprised that Appellants cannot point to a single case, nor have we been able to find one, that has ordered so unusual a remedy. For it is one thing for a court sitting in equity to proscribe policymakers from employing unambiguously racial bases for decision-making and to order government entities to make annexation decisions on race-neutral grounds, but it is quite another to force a municipality to expand its physical boundaries by annexation. Moreover, courtordered annexation would bypass an inherently complex political process. A municipality's decision when and where to annex unincorporated property requires a series of carefully-calibrated political and economic judgments. For example, a municipality undoubtedly must consider whether the property is reasonably compact and contiguous to the municipality, whether it contains a sufficient financial base, whether annexation will require a substantial increase in municipal services, and whether annexation will confer any non-pecuniary benefits to the municipality. Only after measured evaluation of these and other factors would a municipality elect to proceed with annexation. In stark contrast, court-ordered annexation circumvents this political process, and may result in numerous unintended adverse consequences.[26]

---

[25]Notably, Appellants have not sought the wholly impracticable remedy of deannexing the Osceola Center, after close to forty years of Belle Glade citizenship.

[26]Moreover, to the extent court-ordered annexation would require the municipality to raise taxes in order to absorb the new property, the remedy would run up against Supreme Court precedent in school desegregation cases. In such cases, the Supreme Court has held that court-ordered tax increases contravene "the principles of comity that must govern the exercise of the District Court's equitable discretion." *Missouri v. Jenkins,* 495 U.S. 33, 50, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990); *see also Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (noting that court's "broad equitable powers" to remedy past discrimination are not unlimited and should "take into account the interests of state and local authorities in managing their own affairs" (internal quotation marks and citations omitted)).

We do not suggest that a federal court would never have the power to order annexation. It is enough for us to conclude that the extraordinary and unprecedented remedy of court-ordered annexation is wholly inappropriate on the facts presented. This conclusion in no way rests on a determination that Florida law prohibits annexation of the Okeechobee Center. Indeed, we agree with the parties that where federal statutory or constitutional rights have been violated, state law will not impede a court from fashioning an appropriate remedy. *See Armstrong v. Adams,* 869 F.2d 410, 414 (8th Cir.1989). We find on this record only that the district court did not err in concluding that court-ordered annexation was an inappropriate remedy to redress Appellants' claims under the Voting Rights Act.

Turning to Appellants' alternate remedy, the district court correctly determined that an injunction ordering the City not to discriminate in future annexation decisions would not satisfy the specificity requirements of the Federal Rules of Civil Procedure. Under Rule 65(d), "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). This specificity requirement is necessary "to protect those who are enjoined 'by informing them of what they are called upon to do or to refrain from doing in order to comply with the injunction or restraining order.' " *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1531 (11th Cir.1996) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2955 (2d ed.1995) (footnotes omitted)). Thus, an injunction must "contain 'an operative command capable of enforcement.' " *Id.* (quoting *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 73-74, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967)). For example, in *Payne v. Travenol Labs., Inc.,* 565 F.2d 895 (5th Cir.1978), the former Fifth Circuit[27] considered an injunction that prohibited "discriminating on the basis of color, race, or sex in employment practices or conditions of employment."

---

[27]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Id.* at 897. Invalidating the injunction for failure to satisfy Rule 65(d)'s specificity requirement, the Court reasoned that where the terms of the injunction are as general as Title VII itself, the injunction does no more than instruct a defendant to "obey the law." *Id.* at 898. A court is incapable of enforcing so broad and vague an injunction.

Appellants seek to enjoin the City from discriminating on the basis of race in its annexation decisions. As this injunction would do no more than instruct the City to "obey the law," we believe that it would not satisfy the specificity requirements of Rule 65(d) and that it would be incapable of enforcement. *See Payne,* 565 F.2d at 898. In short, an injunction prohibiting the City from discriminating against the Okeechobee Center in future annexation decisions is not an available remedy to redress Appellants' alleged injuries.

On this record, Appellants have not established a genuine issue of material fact as to the existence of an appropriate remedy sufficient to satisfy the first *Gingles* prerequisite. Notwithstanding Appellants' failure to identify a suitable remedy, "a federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one." *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 65, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). However, we cannot conceive of an alternative remedy for Appellants' claims. In short, we hold that Appellants cannot meet the first *Gingles* prerequisite.

Although the absence of an available remedy is dispositive of Appellants' claim, we nonetheless consider the second and third *Gingles* factors. Appellant's have similarly failed to establish a genuine issue of material fact as to either of these elements. The second factor requires a showing that the minority group is politically cohesive, while the third demands proof of a majority white voting bloc sufficient to defeat the minority's preferred candidates. *See Gingles,* 478 U.S. at 50-51, 106 S.Ct. 2752. In other words, "[p]roof of the second and third *Gingles* factors ... is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process." *Nipper,* 39 F.3d at 1524. The existence of these factors, together with an appropriate remedy, as well as an assessment under the totality

30

of the circumstances, generally will be sufficient to establish that the challenged practice allows racial bias to dilute the voting strength of the minority population. *See id.* at 1524-25.

Here, Appellants have offered no evidence of political cohesion or a majority white voting bloc. Indeed, as discussed earlier, Appellants' only evidence concerns allegations of Appellees' discriminatory intent. This evidence is wholly insufficient to meet the requirements of the *Gingles* factors. Given the dearth of relevant evidence as to Appellants' section 2 vote dilution claim, Appellants have failed to establish a genuine issue of material fact concerning the second or third prerequisite under *Gingles*. We conclude, therefore, that Appellants have also failed to establish a genuine issue of material fact as to vote dilution, and hold that the district court properly granted summary judgment to Appellees on both of Appellants' section 2 claims.

C.

*Title VI of the Civil Rights Act of 1964*

There are two distinct causes of action arising under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-4a. First, the Supreme Court has recognized a private cause of action to enforce section 601, which prohibits any recipient of federal financial assistance from discriminating on the basis of race, color, or national origin in any federally funded program.[28] *See Alexander v. Choate,* 469 U.S. 287, 293-94, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 607 n. 27, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *id.* at 608 n. 1, 103 S.Ct. 3221 (Powell, J., concurring in judgment); *see also Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). To state such a claim, a plaintiff must establish discriminatory *intent.* *See Alexander,* 469 U.S. at 293, 105 S.Ct. 712. Accordingly, Title VI's protection extends no further than that already afforded under the Equal

---

[28]Section 601 of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d.

Protection Clause of the Fourteenth Amendment. *See United States v. Fordice,* 505 U.S. 717, 732 n. 7, 112

S.Ct. 2727, 120 L.Ed.2d 575 (1992); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1405 n. 11,

1406 (11th Cir.1993) (citing *Alexander,* 469 U.S. at 293, 105 S.Ct. 712; *Guardians,* 463 U.S. at 584 n. 2,

103 S.Ct. 3221; *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th

Cir.1985)).

Second, we have recognized an implied private right of action to enforce the regulations promulgated

under section 602 of Title VI.[29] *See Elston,* 997 F.2d at 1407; *Georgia State Conference,* 775 F.2d at 1417.

These regulations prohibit recipients of federal funds from taking any action that *results* in disparate impact

---

[29]Section 602 of Title VI provides:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

Civil Rights Act of 1964 § 602, 42 U.S.C. § 2000d-1.

or discriminatory effects on the basis of race, color, or national origin.[30]   Under this cause of action, unlike

a claim arising under section 601, a plaintiff may obtain injunctive or declaratory relief by showing, *inter alia,*

that the challenged action has "a disparate impact on groups protected by the statute, even if those actions are

not intentionally discriminatory." *Elston,* 997 F.2d at 1406 (citing *Alexander,* 469 U.S. at 292-94, 105 S.Ct.

712; *Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. 3221; *Georgia State Conference,* 775 F.2d at 1417).

Appellants have raised both of these claims under Title VI. First, they assert that the BGHA

*intentionally* discriminated against the tenants of the Okeechobee Center on the basis of race in violation of

section 601 of Title VI by refusing to petition for annexation.  Second, Appellants allege that the BGHA's

failure to petition *resulted* in discriminatory effects on the basis of race in violation of the disparate impact

regulations promulgated pursuant to section 602 of Title VI. The district court granted the BGHA summary

judgment *sua sponte* on both of these claims, specifically concluding that no meaningful relief could be

fashioned to remedy the alleged wrong.  Appellants contend that this decision was error.  Even if the district

court were correct that it could not order annexation, Appellants argue that the court could have ordered the

---

[30]The Department of Agriculture has promulgated the following regulations relevant to this litigation:

> (2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

> (3) In determining the site or location of facilities, an applicant or recipient may not make selections with the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any of its activities or programs to which the regulations in this part apply, on the grounds of race, color, or national origin;  or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act and the regulations in this part.

7 C.F.R. § 15.3(b)(2), (3).

BGHA to equalize the benefits and services between the two centers. Appellants contend, for example, that the City levies a 50% surcharge for water on the Okeechobee Center tenants. The City does not impose this charge on the Osceola Center tenants because that center is located within the City's municipal boundaries. Although we conclude that the district court properly granted summary judgement *sua sponte*[31] to Appellee BGHA with respect to Appellants' claim arising under section 601, our review of the record compels the conclusion that Appellants were not afforded a sufficient opportunity to be heard on their disparate impact claim arising from the regulations promulgated under section 602 of Title VI.

A district court possesses the power to enter summary judgment *sua sponte* provided the losing party "was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Fed.R.Civ.P. 56(c), motions for summary judgment must be served on opponents at least ten days prior to the hearing. As we have long recognized, "this notice provision is not an unimportant technicality, but a vital procedural safeguard" to a party's right to offer the best defense to any challenge. *Massey v. Congress Life Ins. Co.,* 116 F.3d 1414, 1417 (11th Cir.1997) (citing *National Fire Ins. v. Bartolazo,* 27 F.3d 518, 520 (11th Cir.1994); *Hanson v. Polk County Land, Inc.,* 608 F.2d 129, 131 (5th Cir.1979)). But so long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua sponte* is entirely appropriate. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed.1998).

---

[31]Contrary to the district court's suggestion that Appellants' Title VI claims were properly presented on motion, we believe that the district court entered summary judgment as to these claims *sua sponte. See Burton,* 966 F.Supp. at 1187 n. 11. The City only moved for summary judgment on Appellants' Voting Rights Act claims on the ground that, as a matter of law, it could not be compelled to annex the Okeechobee Center. The district court concluded that the unavailability of the equitable remedy of compelled annexation barred all of Appellants' claims. However, because the unavailability of court-ordered annexation is not dispositive of Appellants' Title VI claims against the BGHA, we cannot say that any party had, in fact, moved for summary judgment on the Title VI claims.

34

Appellants could survive summary judgment on their claim arising under section 601 only if they establish a genuine issue of material fact as to the BGHA's discriminatory *intent* after June 13, 1991, four years prior to the initiation of this lawsuit.[32] Appellants' § 1983 claims also required proof of discriminatory intent during that same period. However, because Appellants themselves moved for summary judgment on their § 1983 claims, it follows that they, in fact, had more than reasonable opportunity to marshal the same evidence of intent in support of their Title VI claim as well. And since Appellants plainly failed to adduce sufficient evidence as to intent with respect to any portion of their § 1983 claims, it likewise follows *a fortiori* that they could not present sufficient evidence of intent as to this Title VI claim either. Thus, the district court properly granted summary judgment *sua sponte* to the BGHA as to Appellants' section 601 claim.

In contrast, Appellants were not afforded sufficient opportunity to defend against summary judgment with respect to their cause of action to enforce the disparate impact regulations promulgated under section 602 of Title VI. To survive summary judgment, in this context, Appellants must establish, among other things, a genuine issue of material fact as to whether the BGHA's failure to petition for annexation of the Okeechobee Center *resulted* in a disparate impact on the Okeechobee Center tenants on the basis of race. *See Elston,* 997 F.2d at 1407. Appellants simply did not have an opportunity to develop or marshal this type of evidence. As we have observed, Appellants' § 1983 claims turned on evidence of the City's discriminatory intent in refusing to annex the Okeechobee Center in 1995. Moreover, Appellants' claims under the Voting Rights Act required evidence of an available remedy—court-ordered annexation or an injunction prohibiting the City from discriminating on the basis of race. But the evidence required to establish these claims is not dispositive of any disparate impact the BGHA's actions may have had on the Okeechobee Center tenants. The record is incomplete and issue has not been joined on this matter. We conclude, therefore, that the district court erred in granting summary judgment *sua sponte* to Appellee BGHA on Appellants' action to

---

[32]This claim is also governed by Florida's four-year residual personal injury statute of limitations. *See Rozar v. Mullis,* 85 F.3d 556, 561 (11th Cir.1996) (holding that Title VI claims are governed by the same statute of limitations applicable to § 1983 claims).

enforce the disparate impact regulations promulgated pursuant to section 602 of Title VI, and we remand this claim to the district court to provide the parties with an opportunity to develop the record as to this distinct claim.[33]

III.

In sum, we hold that Appellants have failed to establish a genuine issue of material fact in support of their claims arising under § 1983, section 2 of the Voting Rights Act of 1965, and section 601 of Title VI of the Civil Rights Act of 1964, and that the district court properly entered summary judgment as to each of these claims. However, with respect to Appellants' claim arising under disparate impact regulations promulgated pursuant to section 602 of Title VI, we conclude that the district court improvidently granted summary judgment to Appellee BGHA. Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further proceedings consistent with this opinion.

---

[33]Appellants also move this Court to reassign the case on remand to another judge. We can find no basis in this record to do so, and, accordingly, deny this application.