TJOFLAT, Circuit Judge,
specially concurring, in which, PRYOR, Circuit Judge, joins.
Section 2 of the Voting Rights Act (VRA) “outlaws election practices that result in racial discrimination.” Nipper v. Smith, 39 F.3d 1494, 1509-10 (11th Cir.1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.). Specifically, it bars any “voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U.S.C. § 1973(a). Focusing only on the “which results in” language, both dissenters argue that we should remand this case to the district court for a trial to determine whether Florida’s felon-disenfranchisement provision[1] produces a racially disparate impact. The majority argues that remand is inappropriate because the dissenters’ theory creates a constitutional question that can be avoided by construing the statute not to cover felon-disenfranchisement provisions.[2] I write separately to demonstrate that, even if the dissenters are correct that the language of section 2 of the VRA unambiguously covers felon disenfranchisement provisions, summary judgment was appropriate in this case because the plaintiffs have not been able to show that whatever denial or abridgement of voting rights resulted from Florida’s felon disenfranchisement provision occurred “on account of race or color.” Remand is therefore not required.
It is true that section 2 of the VRA now requires something less than a showing of actual intent to discriminate by a State or political subdivision. I do not believe, however, that it requires only, as both dissenters imply, a showing of racially disparate effects. A brief discussion of section 2’s history demonstrates this point. In 1980, the Supreme Court decided City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Prior to its holding in that case, a number of circuits had applied a “totality of the circumstances” analysis in vote-dilution cases brought under the Equal Protection Clause of the Fourteenth Amendment. The old Fifth Circuit, our predecessor court, established the framework for this kind of analysis in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973). That framework required courts to judge vote-dilution cases by measuring the relevant facts according to a number of factors, now commonly referred to as Zimmer factors.[3] Importantly for purposes of this diseus *1236 sion, those factors required a showing of something less than intent by a State actor to discriminate, but something more than a mere disparate impact to make out a claim of vote dilution.
Bolden involved a challenge to an at-large election arrangement in a multimem-ber district in Mobile, Alabama. In that case, the Supreme Court held that Zimmer, “coming before Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 ..., was quite evidently decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the Equal Protection Clause — that proof of a discriminatory effect is sufficient.” Bolden, 446 U.S. at 71, 100 S.Ct. at 1501-02.[4] The Court viewed this conclusion as inescapable in light of Davis, and it concluded that to make out a vote-dilution claim a “plaintiff must prove that the disputed plan was ‘conceived or operated as [a] purposeful devic[e] to further ... discrimination.’ ” Id. at 66, 100 S.Ct. at 1499 (quoting Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)) (alterations and omission original).
In addition to seeking relief under a vote-dilution theory under the Equal Protection Clause, the plaintiffs had also sought relief under the VRA. Bolden rejected this approach, too, holding that “it is apparent that the language of § 2 [of the VRA] no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself.” Id. at 60-61,100 S.Ct. at 1496 (footnote omitted). The Court noted explicitly that this meant by extension that section 2 as then written did not cover disparate-impact cases: “Our decisions ... have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose.” Id. at 62, 100 S.Ct. at 1497.
Apparently alarmed by these holdings, Congress set out to amend the VRA, ultimately doing so in 1982. See generally S.Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177; see also Voting Rights Act Amendments, Pub. L. No. 97-205, 96 Stat. 131 (1982). The effect of this amendment was to recast the then-existing version of section 2 as section 2(a) of the VRA and to add a new subsection, subsection (b).
The wording of the new section 2(a) is not identical to the old section 2. The new *1237 section 2(a) made two modifications: first, it made one change in phrasing. Compare 42 U.S.C. § 1973 (preamendment) (“No voting qualification ... shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.” (emphasis added)), with 42 U.S.C. § 1973(a) (postamendment) (“No voting qualification ... shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color.” (emphasis added)). Second, 2(a) added a phrase to make clear that abridgement or denial could be recognized “as provided in subsection (b).” 42 U.S.C. § 1973(a). The intended effect of the second modification is obvious; that of the first less so. As I explain, the first modification reflects Congress’s desire to remove an intent requirement, but it does not reflect a desire to replace it with a mere disparate-impact requirement.
It is clear from both the language of the new subsection (b) and the extensive Committee Report that accompanied the amendment that Congress intended to restore what it perceived to be the pre-Bolden status quo. Specifically, the subsection (b) language reflects vote-dilution rhetoric from pre-Bolden Supreme Court cases. Compare 42 U.S.C. § 1973(b) (“A violation ... is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.”) with, e.g., White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973) (“The plaintiffs’ burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.”). The Committee Report specifically evinces the view of Congress that Bolden was contrary to its understanding of the operation of section 2, suggesting by strong implication at least that Congress had thought section 2 was operating successfully prior to Bolden. See, e.g., S. Rep. 97-417, at 15 (1982), reprinted in 1982 U.S.C.C.A.N. at 192 (“The proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court’s decision in Bolden.”).
Consistent with that intent, we have, as Judge Barkett suggests in her dissent, applied section 2 in the vote denial context. See Burton v. City of Belle Glade, 178 F.3d 1175, 1197-98 (11th Cir.1999). Dismissing the vote-denial claim in a cursory manner in that case, however, we did not pause to establish the minimum requirements of a prima facie vote-denial claim under section 2, and the case is thus of dubious prece-dential value, especially in support of the proposition that mere disparate impact is sufficient to establish such a claim. In fact, if anything, our holding on the vote-denial claim in Burton stands for a contrary conclusion.[5] In short, nothing in *1238 Burton requires us to return this case to the district court simply because Florida’s felon-disenfranchisement law disadvantages minorities out of proportion to their makeup of the general population of the State.
Thus, the pre-Bolden application of section 2, along with the legislative history surrounding the amendment and our own postamendment application of section 2 in the vote-denial context all point to the inexorable conclusion that something more than a mere showing of disparate effect is essential to a prima facie vote-denial case.[6] The reservoir of that requirement and the key to understanding the minimum content of such a case lie in the words “on account of’ in subsection (a), for those words alone constrain the preceding, seemingly broad “applied in a manner which results in” language. Those words do not suggest, as the majority intimates, that Congress may have designed some lingering requirement of intent by state actors. See ante, at 1229 n. 30. Instead, as I have argued elsewhere, these words suggest a causation requirement, that is, a showing that racial bias in the relevant community caused the alleged vote denial or abridgment.[7] Zimmer set out some of the circumstantial factors that might be referred to in attempting to show such causation in the vote-dilution context, some of which are transferrable to the vote-denial context. I am mindful that voting rights are protected against “sophisticated as well as simpleminded modes of discrimination,” Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939), and that we should be alert to unconventional factors indicating bias-caused vote denials. But I do not believe there are any factors of causation, whether to be found in our precedent or in our wildest dreams, that can establish anything on the basis of the facts presented in this case other than that the *1239 cause of the denial of the right to vote to felons in Florida consists entirely of their conviction, not their race.
Nearly all of the evidence advanced by the plaintiffs demonstrates only dispropor-tionality, but, as I have argued, it is a basic section 2 principle that something more must be shown to survive summary judgment. Plaintiffs argue in their brief that their proof “was significantly more extensive than simply ‘evidence of disproportionate impact,’ ” but they rely chiefly on “different outcomes for similarly situated offenders at various stages of the criminal justice process.” The main thrust of their argument is that “racial bias in the criminal justice system” interacts with Florida’s disenfranchisement provision to the disadvantage of minority voters. It is true that, if plaintiffs could support this claim with evidence, they might demonstrate the sort of causal connection between racial bias and disparate effect necessary to make out a vote-denial claim. But the evidence plaintiffs advance simply does not support this proposition, even if we were to reverse the district court’s order excluding various experts from testifying. In fact, leaving aside the excluded evidence and raw disparate impact data, plaintiffs’ brief does not appear to advance a single showing of contemporary race bias that ostensibly is producing the comparatively well-evidenced disparate-impact.[8]
Thus, I do not believe that plaintiffs have made a case sufficient to survive summary judgment. I would avoid the task of determining whether a constitutional question is created by application of section 2 to felon-disenfranchisement provisions entirely and simply rule that plaintiffs do not have a case. In any event, even if the dissenters are correct that the majority has misanalyzed the statutory-interpretation question, the majority has arrived at the correct judgment in this case. I thus concur.

. The Florida constitution provides that "[n]o person convicted of a felony ... shall be qualified to vote or hold office until restoration of civil rights.” Fla. Const, art. VI, § 4 (1968).

. The constitutional question is created by the Fourteenth Amendment's savings clause regarding such provisions. See U.S. Const, amend. XIV, § 2.

. Those factors are canvassed in the original opinion:
It is axiomatic that at-large and multi-member districting schemes are not per se unconstitutional. Nevertheless, where the petitioner can demonstrate that "its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice,” White v. Regester, 412 U.S. [755,] 766, 93 S.Ct. [2332,] 2339, 37 L.Ed.2d [314 (1973)], Whitcomb v. Chavis, 403 U.S. [124,] 149-150, 91 S.Ct. 1858[, 1872, 29 L.Ed.2d 363 (1971)], such district-ing schemes are constitutionally infirm.
The Supreme Court has identified a panoply of factors, any number of which may *1236 contribute to the existence of dilution. Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives .... [W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, antisingle shot voting provisions and the lack of provision for at-large candidates running from particular geographical sub-districts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court’s recent pronouncement in White v. Regester demonstrates, however, that all these factors need not be proved in order to obtain relief.
Zimmer, 485 F.2d at 1304-05 (footnotes and internal cross-references omitted).

. No one spoke for the Court in Bolden. Although six Justices concurred in the Court’s judgment, Justice Stewart wrote only for himself, Chief Justice Burger, and Justices Powell and Rehnquist. For purposes of brevity, I do not pause to make this observation at every reference to Justice Stewart’s opinion.

. We can assume from the facts of Burton that the plaintiffs had alleged that the challenged policy in that case had in fact produced a disparate impact to the disadvantage of minority voters. By implication, that allegation was not in itself sufficient to sustain a vote-denial claim, as the court concluded that "Appellants have failed to raise a genuine issue of material fact as to whether they were *1238 denied the right to vote on account of race.” Burton, 178 F.3d at 1198.

. Additional support for this proposition can be found by implication in the final proviso of subsection (b): "Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.” 42 U.S.C. § 1973(b).

. See Nipper, 39 F.3d at 1515-24; id. at 1524 (opinion of Tjoflat, C.J., joined by Anderson, J.) ("[A] plaintiff must prove invidious discrimination in order to establish a violation of section 2 of the Voting Rights Act. Specifically, the plaintiff may prove either: (1) discriminatory intent on the part of [state actors] or (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme.”); Solomon v. Liberty County, 899 F.2d 1012, 1032 (11th Cir.1990) (en banc) (Tjoflat, C.J., specially concurring, joined by Fay, Edmondson, Cox, and Hill, JJ.) ("Prior to Bolden, in order to win a voting rights case, a plaintiff had to prove invidious discrimination. This could be done in one of two ways .... [T]he invidious discrimination requirement, as well as the two methods of proving it, remained part of section 2 [after amendment].”). Essentially, section 2 reflects an acknowledgment by Congress that even a facially neutral voting scheme can operate as a circuit for the oppression of minority voters by powerful private parties regardless of legislative intent. It maintains a requirement, however, that such oppression be “on account of race or color,” and thus that intent to produce a denial or abridgment of the right to vote on that basis be present somewhere in the relevant community.
The Supreme Court recently gave similar meaning to the analogous phrase "on the basis of” when it held that Title IX authorizes an implied private right of action based on a claim of retaliation for whistle-blowing. See Jackson v. Birmingham Bd. of Educ., — U.S. -, 125 S.Ct. 1497, 1500, 161 L.Ed.2d 361 (2005) (defining "retaliation” to be " 'on the basis of sex’ because it is an intentional response to the nature of the complaint: an allegation of sex discrimination” (emphasis added)).

. Furthermore, notwithstanding the requirement that we view plaintiffs’ evidence favorably in light of the procedural posture of this case, their burden is significant in light of the numerous filters and checks built into our criminal-justice system that are independently capable of weeding out cases improperly infused with racial motives. Those checks include grand juries, the right to a trial by a jury (and specifically by a jury whose composition has not been manipulated on the basis of race), an impartial judge supervising the trial, appellate and collateral state-court review, federal habeas review, and clemency.