[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15467

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 30, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 07-00147-CV-ORL-22-DAB

ROBERT STITZEL,
as Co-Guardian of Michael Stitzel,

Plaintiff-Appellant,

versus

NEW YORK LIFE INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 30, 2009)

Before MARCUS and HILL, Circuit Judges, and VOORHEES,* District Judge.

_____

* Honorable Richard L. Voorhees, United States District Judge for the Western District
of North Carolina, sitting by designation.

PER CURIAM:

Plaintiff-Appellant Robert Stitzel ("Stitzel"), father and legal co-guardian of the Insured, Dr. Michael Stitzel ("Dr. Stitzel"), appeals the final judgment in favor of the Defendant-Appellee and Insurer, New York Life Insurance Company ("NYL"). Dr. Stitzel, a former veterinarian, is insured under a major medical insurance policy ("the Policy") administered by NYL. Plaintiff sued for declaratory relief and damages following NYL's denial of coverage for Dr. Stitzel's residence and treatment at the Health Center of Merritt Island ("HCMI"), a skilled nursing facility located in Merritt Island, Florida. The district court granted summary judgment in favor of NYL. For the reasons set forth herein, we affirm in part, reverse in part, and remand for further proceedings.

I.

In 1997, Dr. Stitzel was diagnosed with a malignant brain tumor. Dr. Stitzel underwent a craniotomy to surgically remove the tumor and subsequently received chemotherapy and radiation treatment for six to eight months. In the course of radiation treatment, Dr. Stitzel suffered an injury to his spinal cord which resulted in a condition called myelopathy.[1] Dr. Stitzel was rendered a quadriplegic with minimal ability to control head and neck movement. Dr.

---

[1] Myelopathy is defined as "a disorder of the spinal cord." STEDMAN'S MEDICAL DICTIONARY 264850 (27th ed. 2000).

Stitzel is also dependent upon a medical ventilator to breathe. In his present condition, Dr. Stitzel's required medical regimen includes a tracheostomy tube, a gastrostomy tube, and a urinary catheter. He is unable to hold his head up without assistance and also receives care for pain management.

Given his injuries, Dr. Stitzel's initial prognosis was terminal. In 2000, while being treated as a "terminally ill patient,"[2] Dr. Stitzel lived at home and received medical benefits under the Policy for "end of life" Hospice care. While the record does not reflect exactly when Dr. Stitzel's treatment and care shifted from Hospice care to chronic care, Dr. Stitzel's condition eventually stabilized such that he was able to remain at home with the benefit of in-home nursing services. Although Dr. Stitzel remained at home until late 2003, the record is likewise silent as to the length of time Dr. Stitzel remained at home in a stable or "baseline" condition.[3]

---

[2] The Policy defines a "TERMINALLY ILL PATIENT" as one "who has a life expectancy of six months or less" and has certification of life expectancy by his or her doctor. (Policy at 24) If an Insured lives more than six months, NYL may still consider the Insured a terminally ill patient if his or her doctor again certifies a life expectancy of six months or less. (Policy at 24) The Policy does not provide a limit on the number of times an Insured can be certified as terminally ill.

[3] The parties' medical experts appear to agree generally that the term "baseline" refers either to a permanent chronic condition that can typically be managed on an outpatient basis or the stabilization of an "acute" condition which may or may not be related to an existing chronic condition. A baseline condition may be distinguished from an acute process or condition, which requires a more immediate or intensive level of care and, as such, might warrant inpatient treatment in a hospital setting. In this case, it is undisputed that Dr. Stitzel's "baseline" condition as a ventilator-dependent quadriplegic is a persistent "chronic" condition as opposed to an

In 2003, Dr. Stitzel and his wife separated. Following a brief stay in the hospital, Dr. Stitzel was placed at HCMI for residential and skilled nursing care.[4] At HCMI, Dr. Stitzel receives care from nurses and other caregivers, whose responsibilities include suctioning his tracheostomy tube, bathing him, and administering his medication. He periodically leaves the facility in a specially-equipped van accompanied by a private duty nurse for various activities, including lunch, trips to a local veterinary office, visits with his family, and trips to the park and the mall.

Dr. Stitzel has already received benefits from NYL in the amount of $1,922,926.37. After the maximum lifetime benefit increased from $2 million to $5 million, benefits were sought under the Policy for Dr. Stitzel's stay at HCMI, a private duty nurse, and a new electric wheelchair.[5] The requests were denied. NYL initially determined that the care Dr. Stitzel received at HCMI was merely

"acute" illness. That is not to say that Dr. Stitzel doesn't occasionally suffer from acute illnesses such as pneumonia and infection.

[4] The record is not clear regarding whether Dr. Stitzel's medical condition would have provided him the option of returning home at that point if he and his wife had not separated.

[5] At present, Dr. Stitzel's HCMI residency costs are covered by Medicaid benefits. However, obtaining insurance coverage under the Policy would minimize the portion paid by Medicaid and, therefore, result in an increase in Dr. Stitzel's monthly social security benefits.

"custodial" in nature. After two administrative appeals, NYL approved payment for the electric wheelchair and for 120 days of "Convalescent Care" benefits for the HCMI placement. In doing so, NYL recognized the medical necessity of the HCMI placement in light of the fact that Dr. Stitzel was ventilator-dependent.[6] Mr. Stitzel unsuccessfully sought extended coverage for the HCMI placement under the "Special Alternatives" and "Skilled Nursing Facility" provisions of the Policy.

Following NYL's denial of coverage for Dr. Stitzel's continued stay at HCMI, Dr. Stitzel's mother and temporary guardian, Barbara Whitley, filed suit against NYL in Florida state court, Brevard County, for declaratory relief pursuant to Florida's Declaratory Judgment Act, FLA. STAT. ANN. §§ 86-86.111, to determine the benefits due under the Policy. NYL timely removed the case to federal court based upon diversity of citizenship. Shortly thereafter, Dr. Stitzel filed an Amended Complaint which added a state law claim for breach of contract.[7] NYL moved for summary judgment, and the district court granted the motion.

Plaintiff now appeals the summary judgment decision.

---

[6] In approving convalescent care coverage, NYL explained "Dr. Stitzel's care is not custodial as he is ventilator dependent therefore (sic) the medical necessity and appropriateness for Convalescent Care Facility (sic) has been established." (Am. Compl. Exh. 5)

[7] The Amended Complaint also identified Robert Stitzel, Dr. Stitzel's father and permanent co-guardian, as the representative plaintiff in place of Ms. Whitley, the named plaintiff upon commencement of the suit.

## II.

The district court's grant of summary judgment is reviewable *de novo*. Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007). The district court's interpretation of the Policy is likewise subject to a *de novo* review. Fla. Recycling Svc's v. Orlando Auto Auction, 898 So. 2d 129, 131 (Fla 5th DCA 2005).

Under Fed. R. Civ. P. 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." On summary judgment, the court views "the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." Greenberg, 498 F.3d at 1263 (quoting Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999)). The reasonable inferences drawn in favor of the nonmoving party "need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995) (quoting WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir.1988)).

"When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one." Jeffery, 64 F.3d at 594. Thus, the proper inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

III.

A.

"[I]n construing insurance policies, courts should read every policy as a whole, endeavoring to give each provision its full meaning and operative effect." Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000); see also FLA. STAT. §627.419(1) (2008) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto").[8] Thus, "a single policy provision should not be read in isolation and out of context." First Prof'ls Ins. Co. v. McKinney, 973 So.2d 510,

---

[8] Florida law governs our analysis because "[u]nder the *Erie* doctrine, a federal court adjudicating state law claims applies the substantive law of the state." See Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 412 F.3d 1224, 1227 (11th Cir.2005) (internal citations omitted). "In particular, "[t]he construction of insurance contracts is governed by substantive state law."" Id. In any event, the parties don't dispute that Florida law applies.

514 (Fla. 1st DCA 2007). An insurance contract should be construed according to its plain meaning and "receive a construction that is reasonable, practical, sensible, and just." Id. "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous." Garcia v. Fed. Ins. Co., 969 So.2d 288, 291 (Fla. 2007) (quoting Anderson, 756 So.2d at 34). Although "[a]mbiguities in insurance contracts are interpreted against the insurer and in favor of the insured," for such a construction to apply, "the provision must actually be ambiguous." Id. "The mere fact that an insurance contract is complex and requires some analysis to interpret it does not, by itself, render the agreement ambiguous." McKinney, 973 So.2d at 514; see also Garcia, 969 So.2d at 291.

For our purposes, there are three potentially relevant Policy provisions: Convalescent Care, Skilled Nursing Care, and Special Alternatives. We briefly describe each:

### i. Convalescent Care[9]

The Policy authorizes charges "by a CONVALESCENT CARE FACILITY for room and board and the related MEDICAL CARE and services, if:

---

[9] The capitalized terms and phrases within the quoted portions of the Policy are likewise capitalized herein.

8

1. the CONVALESCENT CARE FACILITY confinement follows a HOSPITAL stay of at least 3 days;

2. the COVERED PERSON'S DOCTOR certifies that confinement in the CONVALESCENT CARE FACILITY is necessary to treat the INJURY or SICKNESS which caused the HOSPITAL stay; and

3. the confinement in the CONVALESCENT CARE FACILITY begins within 14 days after such HOSPITAL stay.

(Policy at 10) "However, the prior HOSPITAL stay requirement will be waived if the COVERED PERSON'S DOCTOR certifies that the confinement … was in lieu of a HOSPITAL stay, subject to approval by New York Life." (Policy at 10)

Under the Policy, "CONVALESCENT CARE FACILITY means a licensed institution primarily engaged in providing skilled nursing and rehabilitation services to sick or injured patients on a post-HOSPITAL basis, and which provides:

(a) room and board;

(b) continuous nursing service on the premises under the full-time supervision of a DOCTOR or a registered or graduate nurse;

(c) the services of a DOCTOR available under an established agreement;

(d) daily medical records for each patient;

(e) planned programs and procedures developed and reviewed periodically by a professional group of at least one DOCTOR or a registered or graduate nurse; and

(f) appropriate methods and procedures for handling and administering drugs and biologicals."

(Policy at 21) "CONVALESCENT CARE FACILITY does not include: a HOSPITAL; a rest home; a maternity home; a facility for educational care; a place for care of the aged, blind, deaf, alcoholics, mentally ill or drug addicts; a retirement community and / or adult residences; a group housing community; and / or a place for custodial care." (Policy at 21) The Policy Maximum limits benefits for convalescent care to a period of "120 days per confinement." (Policy Schedule)

## ii. Skilled Nursing

Skilled nursing facility charges are also identified as "eligible expenses" under the Policy. (Policy at 14) Expenses for care under the "SKILLED NURSING FACILITY" provision "must be in place of a hospital confinement and the treatment provided must require skilled nursing services." (Policy at 14)

A SKILLED NURSING FACILITY is defined as "a licensed institution or a section of a HOSPITAL, primarily engaged in providing skilled nursing services for sick or injured inpatients, and which has:

(a) continuous nursing service under the full-time supervision of a DOCTOR or a registered professional nurse;

10

(b) the services of a DOCTOR available under an established agreement; and

(c) clinical records for all patients.

SKILLED NURSING FACILITY does not include a nursing home, a rest home or a place for care of the aged, alcoholics or drug addicts." (Policy at 24) The Policy Maximum does not limit the length of authorized care in a skilled nursing facility, nor does the Policy prescribe a maximum benefit specific to skilled nursing care.

### iii. Special Alternatives

"Special Alternatives is a service approved by New York Life to arrange for care at home or other alternate methods of medical care of [sic] treatment, not otherwise covered under the Policy, instead of HOSPITAL confinement." (Policy at 19) "Benefits will be payable for these charges when a COVERED PERSON:

1. is discharged from the HOSPITAL sooner than would have been possible without Special Alternatives; or

2. would otherwise have been required to be confined as an inpatient in a HOSPITAL.

The treatment plan must be in writing and approved by New York Life in advance."

(Policy at 19)

11

According to the district court, the "central issue" was to interpret and assign meaning to the similar policy language used in the clauses identified herein, namely, the phrases: "in lieu of a hospital" ("Convalescent Care Facility" provision); "in place of a hospital confinement" ("Skilled Nursing Facility" provision); and "would otherwise have been required to be confined as an inpatient in a hospital" ("Special Alternatives" provision). (August 22, 2008 Summ. J. Order at 10.) The court found "these three terms are not ambiguous" and held that "[t]hey mean that the only other option for the insured is to be an inpatient in a hospital." Id.

Significantly, the district court rejected the Defendant's argument that, under these provisions, the alternative facility must "have all the amenities available at a hospital or be equivalent in every way to a hospital," because such a reading would unreasonably "remove from coverage any facility that is not identical to a hospital, contrary to the language of the provisions." (Summ. J. Order at 10-11.) Instead, the court found that a reasonable reading would merely require the facility "to be adequate to keep a particular person out of the hospital who would 'otherwise' have to be there." Id. Additionally, the court held as a matter of law, that "confinement" under the Policy does not require that the patient be confined at all times to the facility (e.g., bedridden). Id. at 14. Thus, Dr.

12

Stitzel's activities away from HCMI did not mean that he was not confined to HCMI. Id. We agree fully with the district court's interpretation of the relevant Policy language and find the construction reasonable, practical, sensible, and just.

However, it is the application of the Policy language, as construed by the district court, that is problematic.[10] A proper analysis of Dr. Stitzel's claim requires us to look first at the criteria governing eligibility determinations generally. Under the Policy, "Covered Expenses" include charges for "MEDICAL CARE" which is "MEDICALLY NECESSARY…." (Policy at 15, 29) The Policy defines "MEDICAL CARE" as:

> "medical services, treatment, medication ... provided or ordered by a DOCTOR, which are necessary for diagnosing or treating an INJURY ....

Id. at 23. The term INJURY "means only bodily injury sustained by an accident."[11] Id.

---

[10] Both Appellant and Appellee framed the issue on appeal as involving a question of law only (i.e., interpretation of the Policy language).

[11] The Policy refers repeatedly to either SICKNESS or INJURY as the trigger for medical care. The Court finds injury here given that Dr. Stitzel's current medical state is the result of "bodily injury sustained by an accident" that occurred during prescribed treatment after removal of the brain tumor.

13

"MEDICALLY NECESSARY" care is described as follows:

"(a) [] the type of setting and the type and length of service are essential to providing adequate care and are consistent with the symptoms, diagnosis or treatment of an INJURY ...; and

(b) is in accord with generally accepted medical practice."

(Policy at 24) (emphasis added)   The Policy states that  "New York Life may rely upon the advice of medical consultants and commonly recognized national medical organizations in determining which service ... [is] MEDICALLY NECESSARY."  Id.

The Policy excludes expenses for "Custodial Care," "Nursing Home" care, "Non-Medically Necessary" care, and "Unnecessary Care."[12]  Id. at 21, 22, 23. Additionally, the Policy highlights NYL's role in approving coverage by expressly stating:

"IMPORTANT NOTICE: The fact that a DOCTOR may prescribe, order, recommend or approve a service ... does not automatically make the service ... a covered expense."

Id.

In terms of the scope of coverage provided Dr. Stitzel, NYL contends that Policy benefits are only provided for *acute* care as opposed to *chronic* care.

---

[12]  As noted above, in reversing an earlier denial of coverage under the Convalescent Care provision, NYL determined that Dr. Stitzel required more than "custodial care." (Am.Compl. Exh. 5)

14

Accordingly, NYL asks that the Policy, as a whole, be read to exclude benefits for long-term chronic care like that being sought on behalf of Dr. Stitzel. In support, NYL insists that the Policy is a "major medical policy" and, therefore, is not intended to provide coverage for long-term chronic care.[13] The Policy does not include any language that bears out NYL's contention. In fact, of the three provisions at issue here, only one – Convalescent Care – is subject to a time restriction.

Appellant Stitzel cites the definition of "HOSPITAL" in support of its argument that the Policy contemplates medical care for chronic conditions. While the Policy definition of "HOSPITAL" makes reference to care associated with "chronic disease," the definition of HOSPITAL is most instructive regarding

---

[13] The Court may take judicial notice that (per industry materials) a "major medical policy" is generally considered more expansive, and thus tends to provide greater coverage than less costly health insurance offerings such as health maintenance organizations ("HMO"), preferred provider organizations ("PPO"), or point of service ("POS") plans. In any event, the Court is not persuaded that the characterization of the Policy as a major medical policy advances the position of either party.

15

classification of a given facility under the Policy.[14]  HCMI's  facility classification

is not at issue.[15]

Consistent with the district court's  construction of the Policy, we reject

NYL's contention that coverage under the relevant provisions is only triggered if

the Insured is in need of acute medical care.  Not only does the Policy language

reveal these three provisions to be *alternatives* to hospitalization, and more

economical alternatives at that, but the inquiry as to whether care is "medically

necessary" is relatively broad.  The Policy expressly mentions the "type of setting"

as well as the "type and length of service" that "adequate care" may entail under

the circumstances.   Reference to the type of setting tends to show that coverage is

---

[14] Under the Policy, HOSPITAL means:

1. a licensed institution primarily engaged in providing medical services for inpatients, if such institution has:
    a. permanent facilities for diagnosis and surgery, except that: the surgery requirement does not apply to a HOSPITAL which is: (1) *primarily engaged in providing treatment of inpatients for ... chronic diseases ...*; or (2) rendering treatment or services for rehabilitation after an INJURY ...;
    b. 24-hour-a-day nursing service by registered professional nurses on duty or call; and
    c. continuous supervision by staff of one or more DOCTORS;
    …
HOSPITAL does not include a convalescent home, a nursing home, a rest home, a place for the aged *or an extended care facility*.

(Policy at 23) (emphasis provided)

[15] It is undisputed that HCMI satisfies the Policy criteria for  SKILLED NURSING FACILITY and neither party asserts that HCMI must constitute a HOSPITAL as defined within the Policy.

16

available to an insured in multiple settings. Indeed, in some cases NYL authorizes payment of benefits for "special alternatives" to traditional care. In addition, discussion of the "type and length of service" indicates that the length of the prescribed care may differ from patient to patient. Such is the nature of medicine. For these reasons, we think the Policy should not be construed or applied in a manner that limits coverage solely to expenses associated with acute care. Rather, eligibility determinations under the Policy necessarily depend upon whether or not the specific medical care for a given Insured is medically necessary to ensure the patient receives care which is "adequate" and "in accord with generally accepted medical practice."

B.

Having resolved issues concerning construction of the Policy, the Court next considers whether the district court erred in deciding, as a matter of law, that Dr. Stitzel's placement at HCMI does not constitute a "medically necessary" alternative to hospital confinement. Because Appellant Stitzel focused on skilled nursing care benefits during argument, we address this provision first.[16]

---

[16] Counsel for NYL questioned whether Appellant effectively abandoned the Convalescent Care or Special Alternatives arguments by failing to discuss these two provisions during oral argument. However, because the arguments regarding all three provisions were fully briefed, and because there was no express waiver, we do not consider them abandoned. See FED. R. APP. P. 28(a)(9)(A); Flanigan's Enter, Inc. v. Fulton County, 242 F.3d 976, 987 n. 16 (11th Cir.2001) (party waives issue not developed in its briefs); but see 5 Am. Jur. 2d Appellate Review §543 (2009) ("Courts consider claims abandoned at oral argument to be waived,

NYL concedes that HCMI satisfies the Policy definition of SKILLED

NURSING FACILITY.  A Skilled Nursing Facility, by definition, is an

*alternative*  to hospitalization.

For  purposes of its decision-making, the Policy provides NYL the right to

"rely upon the advice of medical consultants and commonly recognized national

medical organizations" in determining whether a particular expense is medically

necessary. (Policy at 24)  In this case, Dr. Stitzel provided  deposition testimony

of two of his treating physicians.  Both physicians agreed that Dr. Stitzel's

baseline condition did not require traditional inpatient hospitalization but

emphasized that Dr. Stitzel must have 24/7 access to skilled nursing care in the

event he encounters a problem with his ventilator. (Podnos Dep. 10, 12-13, 20, 30-

31; Aziz Dep. 9-11, 16, 20;April 15, 2008, Doc. 43-19)

Dr. Steven Podnos, a pulmonologist who last treated Dr. Stitzel in 2006,

stated that in his opinion, "only two places could provide care for [Dr.

Stitzel]…[an] acute care hospital or a skilled nursing facility." (Podnos Dep. 16,

Apr. 15, 2008, Doc. 43-18.) Dr. Podnos also indicated that he would not be willing

to accept responsibility, as a treating physician, for a patient receiving in-home

---

although there is authority that such abandonment must be explicit.")

care with Dr. Stitzel's condition, unless that patient acknowledged and accepted the "significant risks to be home even with the high level of care." Id. at 20.

Dr. Nabil Aziz, Dr. Stitzel's regular treating physician at HCMI, opined that if Dr. Stitzel could no longer receive care at a skilled nursing facility like HCMI, he would need to be confined to a hospital. Id. at 19. Dr. Aziz explained that, in his view, in-home care is not equivalent to the level or quality of care available to Dr. Stitzel at HCMI. Id.

NYL's medical expert was Dr. Goldstein. The gist of Dr. Goldstein's testimony was that "the services … provided to Dr. Stitzel at HCMI are not equivalent to hospital confinement" – a rationale for decision expressly rejected by the district court. (Goldstein Decl. ¶10, Doc. 43-10.) Dr. Goldstein explained at great lengths that hospitalization is only necessary for patients who require short-term acute medical care, whereas Dr. Stitzel requires primarily long-term chronic care. (Id. at ¶11; Goldstein Dep. 38-39, April 24, 2008, Doc. 44-02.) Dr. Goldstein also stated that Dr. Stitzel's condition can be cared for in the home and that the condition would not qualify for hospitalization under Medicare guidelines. (Goldstein Decl. ¶¶21, 44.) Dr. Goldstein did acknowledge that Dr. Stitzel's condition requires "around-the-clock skilled care," although "not necessarily … nursing" care. (Goldstein Dep. 35-36.)

Moreover, we reiterate that Skilled Nursing Facility benefits are not expressly made subject to a limitations period or other Policy Maximum.[17] Similarly, although the Skilled Nursing Care provision identifies certain types of facilities as falling outside its purview, there is no exclusion for "an extended care facility" like that found within the HOSPITAL definition.

In our view, Dr. Stitzel presented sufficient evidence to survive summary judgment. The opinions of Dr. Stitzel's two physician deponents, stating that proper treatment of Dr. Stitzel's condition requires confinement to either a skilled nursing facility or a hospital, preclude summary judgment disposition. Although both physicians acknowledged that Dr. Stitzel's baseline condition does not generally require the acute medical care available in a hospital and, under the proper circumstances, may be treated at home, both of Dr. Stitzel's medical experts offered their professional opinion that the better practice (i.e., "optimal care") would be to provide skilled nursing care for Dr. Stitzel in a facility such as HCMI.

The district court held there was no genuine issue of material fact because the Defendant relied primarily *on Plaintiff's evidence* to show non-hospital

---

[17] The Skilled Nursing Care provision may then be contrasted with the 120-day limitation on benefits for convalescent care. In addition, as noted, *supra*, the Policy contrasts a HOSPITAL with "a convalescent home, a nursing home, a rest home, a place for the aged or *an extended care facility*." (Policy at 23) (emphasis added)

alternatives to HCMI, including care received in the home. The district court never addressed the fact that Drs. Podnos and Aziz based their professional opinions that Dr. Stitzel requires either hospitalization or placement at HCMI on their assessment of Dr. Stitzel's baseline condition as a ventilator-dependent quadriplegic. (Podnos Dep. 8, 16; Aziz Dep. 19, 21.) The district court then discounted the medical opinions of Drs. Podnos and Aziz because neither physician was aware prior to being deposed that Dr. Stitzel had previously received in-home care for a period of time.[18] In doing so, the district court engaged in an improper weighing of the evidence.

In conclusion, whether Dr. Stitzel's care at HCMI is "medically necessary" is a factual determination that falls squarely within the province of the jury. The testimony of Dr. Podnos, Dr. Aziz, and the defense medical expert Dr. Goldstein should be weighed and evaluated by a jury.

Finally, given that the district court applied essentially the same reasoning in denying coverage under Skilled Nursing Care, Convalescent Care, and Special Alternatives, remand is appropriate with respect to all three provisions.[19]

---

[18] Knowledge of Dr. Stitzel's prior in-home treatment several years earlier, explored during cross-examination and on redirect, did not alter in any way the professional opinions of Drs. Podnos or Aziz.

[19] We need not reach or decide whether additional bases exist for denying coverage under the Convalescent Care and Special Alternatives provisions.

For the reasons set forth here, the judgment of the district court which terminated the case in favor of the defendant, is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**