MARTIN, J., concurring in part and dissenting in part:
The U.S. Constitution allows states to ban people convicted of felonies from exercising their right to vote. See Richardson v. Ramirez, 418 U.S. 24, 56, 94 S.Ct. 2655, 2671, 41 L.Ed.2d 551 (1974). Florida does this through laws that put the burden on convicted felons to have their right to vote restored. See Fla. Const. Art. VI, §§ 4 (a), 8(a); Fla. Stat. Ann. §§ 97.041, 944.292. It is these laws that are the core of the case before us.
In Florida, a person with a felony conviction may legally vote only if the Governor and two additional members of the Clemency Board ("Board") restore her voting rights. See Fla. R. Exec. Clemency 4. The Board's power in this regard is without limit. The Board has the "unfettered discretion to grant [restoration of the right to vote] at any time, for any reason." Id. at 4. Likewise, the Governor has "unfettered discretion to deny [this restoration] at any time, for any reason." Id. Thus, the Board and the Governor have complete control over whether and when those with a felony conviction are permitted to vote and thereby take part in "the essence of a democratic society." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).
The plaintiffs in this case are nine Floridians who have been convicted of felonies and have served their sentences. They are, however, not eligible to vote, because their restoration applications have either been rejected or have been pending for years.[1] They sued Florida Governor Rick Scott and the three other members of the *1216 Board[2] asserting that Florida's scheme for restoration of voting rights is unconstitutional on its face under the First and Fourteenth Amendments. The District Court granted summary judgment for the plaintiffs. It did so based on its finding that Florida's vote restoration scheme violated the First Amendment's guarantees of Free Expression and Free Association and the Fourteenth Amendment's guarantee of Equal Protection because the scheme allows the Governor and the Board complete, unrestrained discretion in deciding whether and when to grant or deny the restoration of voting rights. The District Court then went on to declare the defendants' vote restoration scheme unconstitutional; enjoin the defendants from enforcing that scheme and from ending all vote-restoration processes; and order the defendants to "promulgate specific and neutral criteria to direct vote-restoration decisions" and "promulgate meaningful, specific, and expeditious time constraints" for vote restoration decisions. The defendants moved the District Court to stay its orders pending appeal. Explaining that the defendants did not meet the demanding requirements for this remedy, the District Court denied their request. Now, Florida asks the same of us.
I.
A stay pending appeal "is an intrusion into the ordinary process of administration and judicial review." Nken v. Holder, 556 U.S. 418, 427, 129 S.Ct. 1749, 1757, 173 L.Ed.2d 550 (2009) (quotation omitted). A stay, in other words, is meant to be used only in extraordinary circumstances. See id. It is "not a matter of right, even if irreparable injury might otherwise result to the appellant." Id. at 438, 129 S.Ct. at 1763 (quotation omitted).
In reviewing a party's application for a stay, we consider four factors to "ensure that courts do not grant stays pending appeal improvidently." Chafin v. Chafin, 742 F.3d 934, 937 n.7 (11th Cir. 2013) (per curiam). Those factors are:
(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.
Nken, 556 U.S. at 426, 129 S.Ct. at 1756 (2009) (quotation omitted).
The first two of these factors are "the most critical." Id. at 434, 129 S.Ct. at 1761. As to the party's likelihood of success on the merits, "more than a mere possibility of relief is required." Id. (quotation omitted); see also id. (indicating that "the traditional stay inquiry calls for assessing" the third and fourth factors "[o]nce an applicant satisfies the first two factors").
II.
The defendants have demonstrated, at most, a mere possibility they may succeed on appeal as to the plaintiffs' First Amendment claims. This demonstration is not enough, in my view, to entitle them to "an intrusion into the ordinary processes of administration and judicial review." Nken, 556 U.S. at 427, 129 S.Ct. at 1757.
The District Court ruled that Florida's vote restoration scheme violated two First Amendment rights: the right to Free Expression and the right to Free Association. In order to reach these conclusions, the *1217 District Court necessarily and actually found that voting constitutes the sort of expressive and associational activity protected by the First Amendment. The District Court decision on the plaintiffs' First Amendment claims is on sound legal footing that could well be adopted by the merits panel of judges of this Court through de novo review.
Despite the defendants' arguments to the contrary, precedent does not require us to reject the reasoning of the District Court.[3] Nor, for that matter, does it establish the requisite "strong showing that [they are] likely to succeed on the merits." Nken, 556 U.S. at 434, 129 S.Ct. at 1761. Most importantly, the Supreme Court has left open the possibility that the First Amendment does protect the right to vote. See Shapiro v. McManus, 577 U.S. ----, 136 S.Ct. 450, 456, 193 L.Ed.2d 279 (2015) (holding that plaintiffs' claim that "Maryland's redistricting plan burdens their First Amendment right of political association" was not frivolous in part because it was "based on a legal theory ... uncontradicted by the majority in any of our cases").
Indeed, in his concurring opinion in Vieth v. Jubelirer, Justice Kennedy suggested that the right to vote may have First Amendment protections. See 541 U.S. 267, 313-16, 124 S.Ct. 1769, 1797-98, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring in judgment). Although Justice Kennedy joined the ruling that the partisan gerrymandering in that case was non-justiciable under the Fourteenth Amendment's Equal Protection Clause and Article I, § 2, he reasoned that the First Amendment may provide an effective vehicle for allegations of partisan gerrymandering, as "these allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." Id. at 314, 124 S.Ct. at 1797. Justice Kennedy continued, noting that "[i]f a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest." Id. at 315, 124 S.Ct. at 1797. If precedent required a contrary conclusion, the Court would have held that the claim in Shapiro was constitutionally insubstantial. But, based in part on Justice Kennedy's conclusions regarding the First Amendment's protection for "participation in the electoral process," the Court allowed the claim to proceed. See Shapiro, 136 S.Ct. at 456.
Neither does this Circuit's precedent foreclose the plaintiffs' First Amendment *1218 claims. The defendants ask us to rule otherwise based on a footnote in Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir. 1999). Burton affirmed the dismissal of a minority vote dilution claim brought under the First, Thirteenth, Fourteenth, and Fifteenth Amendments, and noted that "the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments." Id. at 1187, 1188 n.10. But Burton was only capable of deciding what was before the Court: whether the First Amendment provides more protection than the Fourteenth Amendment for claims alleging that government action has diluted, or impermissibly weakened the effect of, one's right to vote. See, e.g., United States v. Kaley, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us." (quotation omitted) ). Burton did not decide whether the First Amendment protects the right to vote under the circumstances of the plaintiffs before us.[4] These plaintiffs are not making a vote dilution claim. Indeed, they have no vote that could be diluted.[5]
III.
I am therefore aware of no precedent that directly forecloses the plaintiffs' First Amendment claims. We must next inquire into whether precedent from the Supreme Court and our Court supports their claims.
Our First Amendment rights of free expression and free association are most critical when they are invoked to ensure citizens' free and full participation in the political process. "Speech is an essential mechanism of democracy." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010). As with the right of free expression, the Supreme Court has emphasized that the First Amendment right of free association is integral to our democracy's political process. "Political belief and association constitute the core of those activities protected by the First Amendment." Elrod v. Burns, 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976). "Representative democracy ... is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." Cal. Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 2408, 147 L.Ed.2d 502 (2000).
The question, then, is whether there is a compelling argument that these rights of speech and association encompass the right to vote. I believe there is. As I've said, the Supreme Court has left open the possibility that the First Amendment offers distinct protections for the right to vote. See, e.g., Shapiro, 136 S. Ct. at 456.
Beyond that, the Supreme Court has invalidated regulatory regimes that burden the right to vote expressly on First Amendment grounds. Striking down a state regime establishing early filing deadlines *1219 for independent presidential candidates, the Court noted that "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis." Anderson v. Celebrezze, 460 U.S. 780, 786 n.7, 103 S.Ct. 1564, 1569 n.7, 75 L.Ed.2d 547 (1983) ; see also Norman v. Reed, 502 U.S. 279, 288 n.8, 112 S.Ct. 698, 705 n.8, 116 L.Ed.2d 711 (1992) (expressly employing only the First and Fourteenth Amendments in striking down a state law establishing signature requirements for new parties wishing to run candidates in local elections). In Anderson, the Court relied on precedent "identif[ying] the First and Fourteenth Amendment rights implicated by restrictions on the eligibly of voters and candidates." Anderson, 460 U.S. at 786 n.7, 103 S.Ct. at 1569 n.8. The Court noted that the state laws at issue burdened "two different, although overlapping kinds of rights"-the right to freely associate "for the advancement of political beliefs" and the right to vote. Id. at 787, 103 S.Ct. at 1569 (quotation omitted). Thus, the Court has approved of rooting protection for the right to vote in the First Amendment.
This should come as no surprise. Indeed, the Supreme Court has said that the right to vote is "the essence of a democratic society," and "any restrictions on [it] strike at the heart of representative government." Reynolds, 377 U.S. at 555, 84 S.Ct. at 1378. And the right to vote is closely related to, if not encompassed by, the rights of political association and political expression. It is through voting that citizens engage in a form of political association, as Anderson and Norman suggest. Indeed voting allows citizens to speak, by expressing their choice on an issue, party, or candidate. See Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 626-27, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969) (noting that, without the vote, citizens are denied "any effective voice in the governmental affairs which substantially affect their lives"); see also Alexander Meiklejohn, The First Amendment is an Absolute, 1961 Sup. Ct. Rev. 245, 256 (concluding that, "in addition to speech, press, assembly, and petition," the First Amendment protects "the freedom to 'vote,' the official expression of a self-governing man's judgment on issues of public policy," a freedom that "must be absolutely protected"). Thus, I believe there is a compelling argument that the First Amendment independently protects the right to vote, as the District Court found.
IV.
I now turn to the question of whether there is a compelling argument that defendants' scheme impermissibly burdens the plaintiffs' right to vote under the First Amendment. The plaintiffs and the District Court both liken the vote restoration scheme to a permitting or licensing scheme. This analogy is persuasive because the Board is tasked with deciding whether or not to allow-or to permit or license-someone convicted of a felony to vote again.
The Supreme Court has routinely struck down schemes that condition the exercise of First Amendment rights on permits or licenses when an official with unfettered discretion controls that process. See, e.g., Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 133, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992) (striking down ordinance that left the determination of a fee to be charged for assembling or parading "to the whim of [an] administrator"); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 769-72, 108 S.Ct. 2138, 2150-52, 100 L.Ed.2d 771 (1988) (striking down ordinance that gave mayor complete discretion in doling out permits *1220 to publishers seeking public newsracks for their publications). In the same way, the Supreme Court has regularly invalidated government schemes that do not place time constraints on the administrators of such licensing schemes. See, e.g., FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-29, 110 S.Ct. 596, 604-07, 107 L.Ed.2d 603 (1990) (striking down ordinance that set no time limits on administrator charged with deciding whether to issue licenses to adult entertainment businesses); Riley v. Nat'l Fed'n of the Blind of N.C., 487 U.S. 781, 801-03, 108 S.Ct. 2667, 2680-81, 101 L.Ed.2d 669 (1988) (striking down state law that requires professional fundraisers to obtain a license before engaging in solicitation, because there were no express or established customary time limits constraining the decisionmaker).
Our Court has done the same. See, e.g., Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 322 F.3d 1298, 1310-11 (11th Cir. 2003) (en banc) (reiterating that "[a] grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional" and invalidating a scheme that set "no explicit limits" on Department of Aviation's power to set fees on publishers seeking to place newsracks at an airport and allowed the Department to "cancel a publisher's license for any reason whatsoever" (quotation omitted) ); Sentinel Comm. Co. v. Watts, 936 F.2d 1189 (11th Cir. 1991).
These decisions reflect concern that vesting officials with unbridled discretion to determine whether, and when, to allow someone to speak creates an impermissible risk of viewpoint discrimination. As the Supreme Court explained in Plain Dealer, "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship." 486 U.S. at 763, 108 S.Ct. at 2147. The Court continued, "[t]his danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." Id. And that risk is similarly significant where there are no time constraints on that official's decision. FW/PBS, Inc., 493 U.S. at 227, 110 S.Ct. at 605 ("A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.").
The defendants' vote restoration scheme gives them unbridled discretion. In the words of the Rules of Executive Clemency, the Board has "unfettered discretion" to permit an applicant to exercise her right to vote "at any time, for any reason." Fla. R. Exec. Clemency 4. And the Governor has "unfettered discretion" to deny an applicant the right to legally vote "at any time, for any reason." Id. This unbridled discretion is not just concerning when it confronts expressive and associational freedoms traditionally protected by the First Amendment, but also when it threatens the right to vote. See Louisiana v. United States, 380 U.S. 145, 153, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar.").
It is no answer to say we should presume that the Board will exercise its discretion in good faith. The Supreme Court rejected just this defense in Plain Dealer, concluding "this is the very presumption that the doctrine forbidding unbridled discretion disallows." 486 U.S. at 770, 108 S.Ct. at 2151. Instead, "[t]he doctrine requires that [limits on official discretion in such schemes] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established *1221 practice." Id. The defendants make no showing that clear limits restrict their authority. To the contrary, they say the law requires validation of the unfettered discretion vested in the Board and the Governor.
Neither is the answer that, because the defendants can disenfranchise all convicted felons, their choice to selectively re-enfranchise some cannot be subject to limitations. The Supreme Court rejected a quite similar "greater-includes-the-lesser" argument in Plain Dealer.See id. at 762-69, 108 S.Ct. at 2147-50. The Court concluded that "when the government is willing to prohibit a particular manner of speech entirely ... the risk of governmental censorship is simply not implicated." Id. at 768, 108 S.Ct. at 2150. But this case is not about a complete bar-it is about the process by which the Board selectively doles out the right to vote. This case should remind us that the Court "has long been sensitive to the special dangers inherent in a law placing unbridled discretion directly to license speech, or conduct commonly associated with speech, in the hands of a government official." Id. at 767-68, 108 S.Ct. at 2149-50.
The defendants liken their vote restoration scheme to the exercise of clemency power, a power traditionally exercised with minimal limitations from the judiciary. But the defendants recognize that clemency power is not immune from judicial review and constitutional scrutiny. See Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 288-89, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (O'Connor, J., concurring) (holding that, in the due process context, "some minimal procedural safeguards apply to clemency proceedings," suggesting that clemency-by-coin-flip might violate due process); see also Wellons v. Comm'r, Georgia Dep't of Corr., 754 F.3d 1268, 1269 (11th Cir. 2014) (recognizing that Justice O'Connor's Woodard concurrence set binding precedent); Shepherd v. Trevino, 575 F.2d 1110, 1114 (5th Cir. 1978) (concluding that states' power to disenfranchise those convicted of felonies does not permit states to restore voting rights to whites only or otherwise "make a completely arbitrary distinction between groups of felons"). And the defendants point us to no decisions that would require us to reject the plaintiffs' First Amendment claims because they involve matters typically committed to executive discretion. Cf. Osborne v. Folmar, 735 F.2d 1316, 1317 (11th Cir. 1984) (holding that the line of Supreme Court cases that limited procedural due process claims in the context of clemency did not foreclose equal protection claims challenging clemency determinations, e.g., on the basis of invidious discrimination). In my view, drawing up neutral criteria to mitigate the risk that vote restoration decisions are predicated on the applicants' viewpoints or beliefs need not be the tall order the defendants describe. Certainly there are processes by which the First Amendment and executive prerogative can both be respected.
V.
I don't believe the defendants have met their burden under Nken for a stay pending this appeal. They have demonstrated nothing more than a mere possibility of success on the merits of the plaintiffs' First Amendment claim. I would, however, modify the permanent injunction imposed by the District Judge ending all vote restoration processes. See Trump v. Int'l Refugee Assistance Project, 582 U.S. ----, 137 S.Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (noting that a court "may, in its discretion, tailor a stay so that it operates with respect to only some portion of the proceeding" (quotation omitted) ). As I understand Ramirez, the Constitution empowers states *1222 to choose to permanently disenfranchise those convicted of felonies. Richardson v. Ramirez, 418 U.S. at 56, 94 S.Ct. at 2671. Other than that feature of the injunction, I would leave the injunction in place. See Atlanta Journal & Constitution., 322 F.3d at 1312 (retaining "that portion of the injunction that prohibited the administration of any plan that did not explicitly constrain official discretion").
I respectfully dissent.

One plaintiff is not eligible to apply for restoration until June of 2019.

Those members are Florida's Attorney General, Florida's Chief Financial Officer, and Florida's Commissioner of Agriculture.

I agree with the majority that that the Supreme Court's summary affirmance in Beacham appears to foreclose the plaintiffs' Fourteenth Amendment claims. See Beacham v. Braterman, 300 F.Supp. 182 (S.D. Fla.), aff'd, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). In Beacham, a three-judge district court panel found that "it is [not] a denial of equal protection of law and due process of law for the Governor of Florida, with the approval of three members of the Cabinet, to restore discretionarily the right to vote to some felons and not to others."Id. at 184. The Supreme Court summarily affirmed. Beacham v. Braterman, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11. Summary affirmances "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Picou v. Gillum, 813 F.2d 1121, 1122 (11th Cir. 1987) (quotation omitted). Reading the Beacham summary affirmance as foreclosing Fourteenth Amendment claims against Florida's vote restoration scheme is the proper way to understand what the Supreme Court necessarily decided. Thus, I disagree with the majority's more expansive reading of Beacham, and I believe our precedent on interpreting summary affirmances supports my position.

Further support for this conclusion lies in the fact that Burton cited two vote dilution cases as support for this pronouncement: Washington v. Finlay, 664 F.2d 913, 927-28 (4th Cir. 1981), and Lucas v. Townsend, 783 F.Supp. 605, 608 (M.D. Ga. 1992), aff'd on other grounds, 967 F.2d 549 (11th Cir. 1992). See Burton, 178 F.3d at 1188 n.10.

Cook v. Randolph County, 573 F.3d 1143 (11th Cir. 2009), quotes Burton's statement regarding the First Amendment and voting rights. Id. at 1152 n.4. Burton's statement was likewise not necessary to the result in Cook, which held, in pertinent part, that Cook's claim was to be dismissed because "he did not actually suffer a deprivation of any of the constitutional or statutory rights he asserts." See id. at 1152-54.